IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
ATHENS DIVISION

THE UNITED STATES OF AMERICA : 3:24-cr-35-2-TES

VS. : October 1, 2025

KAROL TELLEZ DUARTE : Athens, Georgia
Defendant

TRANSCRIPT OF SENTENCING HEARING
BEFORE THE HONORABLE TILMAN E. SELF, III,
UNITED STATES COURT DISTRICT JUDGE

APPEARANCES:

FOR THE GOVERNMENT: MIKE MORRISON
UNITED STATES ATTORNEY'S OFFICE
300 MULBERRY STREET; STE 400
MACON, GA 31201

FOR THE DEFENDANT: LYNSEY BARRON
1800 PEACHTREE STREET NE
SUITE 300
ATLANTA, GA 30309

TAMMY W. DIROCCO, USCR
P.O. BOX 539
MACON, GA 31202-0539
(478-752-3497)

WITNESS INDEX

PAGE

MATTHEW WINN

Direct Examination By Mr. Morrison .............12

Cross-Examination By Ms. Barron ................54

Redirect Examination By Mr. Morrison ...........68

STATEMENTS BY:

Dulce Mendoza.................................103

Ana Ovieto....................................104

Jerry Livent..................................106

GOVERNMENT'S EXHIBITS


| NUMBER | DESCRIPTION | PAGE |
|---|---|---|
| Gov. 1 | PowerPoint presentation .................. | 13 |

October 1, 2025
11:00 a.m.
Athens, Georgia

P R O C E E D I N G S

CSO OFFICER: All rise.

THE COURT: Thank you-all. Take your seats, please.

The Court calls the case of *United States of America versus Karol Tellez Duarte*. It's Case No. 3:24-cr-35-2. You are Ms. Duarte?

THE DEFENDANT: Yes, Your Honor.

THE COURT: There is a presentence investigation report that was filed on your behalf. Have you seen it?

THE DEFENDANT: Yes, Your Honor.

THE COURT: Did you get an opportunity to speak with Ms. Barron about it?

THE DEFENDANT: Yes, Your Honor.

THE COURT: Did you have an interpreter with you?

THE DEFENDANT: Yes, sir.

THE COURT: Is there any questions about this report that Ms. Barron could not or would not answer for you?

THE DEFENDANT: No questions.

THE COURT: We're going to begin --

MR. MORRISON: Judge, I hate to interrupt. But has the interpreter previously been sworn? I can't remember.

THE COURT: No. But she can be.

MR. MORRISON: If we could, just for the record, Judge.

THE COURT: Go ahead.

COURTROOM DEPUTY: (Swearing in of interpreter.)

THE INTERPRETER: I do. Magally Smith, master licensed legal interpreter.

THE COURT: So let's begin, again, with finding the advisory guideline range for this case.

Count One, conspiracy to commit a bank fraud. We have a Base Offense Level of 7; a 14 because the intended loss is greater than 550 but less than 1.5 million; plus 2 for an offense involving ten or more victims, plus 2 for the offense involved repetitive, coordinated activities and sophisticated technologies; and, finally, a plus 2 for the use of a foreign device. That would give me a total of 27. I take away a minus 3 for acceptance of responsibility, a minus 2 for being a zero-point offender. That would give me a Total Offense Level of 22, with a Criminal History Category of I. That would give me a 41- to 51-month range. Do you agree with that, Mr. Morrison?

MR. MORRISON: Yes, sir.

THE COURT: Ms. Barron?

MS. BARRON: I agree that's what the PSR says, Your Honor.

THE COURT: That's where we start?

MS. BARRON: That's right.

THE COURT: Okay. Now, you've got some objections.

MS. BARRON: I do, Your Honor. And I want to, if the Court will indulge me, I want to apologize. I had in my calendar that this was at 11 a.m., and I usually check the docket to make sure I'm right. I couldn't access the docket. I should have called, and I want to apologize to the Court and to the many employees in this room who are working for free today. I'm very sorry.

THE COURT: We'll get paid eventually, but thank you. Thank you very much. Listen, these things happen. I've been in your shoes. I understand it. We're ready to go now. So tell me your objections.

MS. BARRON: Yes, Your Honor. So I do want to clarify: Do you want me to sit?

THE COURT: I don't care. Whatever makes you more comfortable. You can move the microphone around. Just as long as Tammy can hear, then I won't get in trouble.

MS. BARRON: So I do object to the loss. It's not going to affect -- I agree that a 14-level enhancement applies. What I objected to was the question of relevant conduct. And after communicating with Officer Simpson, she pointed out that I was wrong about the number that I included in my sentencing memo. I said it was just north of 550,000. If we just look at the bolded incidents in paragraph 12, it is

$845,100. So my number is wrong. I do believe that's the right number. And so it doesn't change the offense level, but it does affect restitution. And so that's why I wanted to preserve that objection.

I objected to ten or more victims because --

THE COURT: Well, let me stop you there. I don't really see that as an objection. I mean, you may want to argue about restitution, what applies, but I don't know that it's truly a legal objection.

MS. BARRON: I think, Your Honor, it's more of a factual objection as to what the loss is. So you're correct. I do not --

THE COURT: Yeah, but you could have an $800,000 actual loss that you participated in, but if you're involved with a conspiracy and the Court tags you with the entire conspiracy, you can disagree with that and you may argue that, "Hey, don't do that." You know, it was not reasonably foreseeable, I think is what the Eleventh Circuit would say.

MS. BARRON: Correct.

THE COURT: I think we can have that argument at sentencing, but I just don't -- I don't really see that as a legal objection at this phase. Does that make sense?

MS. BARRON: I think so. I think a 1B1.3 objection is a legal objection. Well, maybe you're right. It's a

question of fact as to whether it was reasonably foreseeable to her. So I do --

THE COURT: It only goes to restitution. It's not going to affect her sentence.

MS. BARRON: Correct. Well, it could affect -- under 3553(a), as to the seriousness of the offense, the loss amount is relevant to that. But I'm not going to quibble.

THE COURT: But that's really sentencing, is what I'm getting at.

MS. BARRON: Correct.

THE COURT: Let's do it this way. Let me do it this way. I'm going to disagree that it's a legal objection, but I'm going to let you preserve that because it doesn't affect the guideline range. Whether it's 562, which we agree it's not, whether it's 847 or 1.463, it really doesn't affect the sentencing guideline range.

MS. BARRON: That's correct. I agree.

THE COURT: The Court still has the authority to vary, depart, et cetera. You can make your arguments then. But I'm just going to leave it as an objection. I'll overrule that, and that way, it preserves it and everything is left the way it is. Does that make sense? Is that fair enough?

MS. BARRON: Yes, Your Honor.

THE COURT: All right. Go to the next one.

MS. BARRON: So it's related to that, and it may

bring this issue up.

So the question is whether there are ten or more victims. So if we are only looking at the conduct in paragraph 12 that is bolded and that both parties agree she was involved in, there are nine financial institutions. And so I understand there's a relevant conduct argument that the Government will make.

THE COURT: This is a legal objection. I agree with you on this one.

MS. BARRON: Okay. So I wanted to preserve that question that there is no evidence that I have seen that the non-bolded robberies were reasonably foreseeable to her, that she was involved in chats. If she was involved, those would be bolded paragraphs. So I objected to that.

THE COURT: Okay.

MS. BARRON: There are two ways to add the enhancement under 2B1.1(b)(c). I'm sorry. It's either under 2B1.1(b)(1)(B) or (b)(1)(C). So (b)(1)(C) is sophisticated means. We hear that all the time.

My argument there was that the Government has to show that not only is the scheme sophisticated but that her particular role in the scheme aided the sophistication. And then alternately, those 2 points can be applied if a substantial portion of the conduct occurs outside the United States.

So I wanted to argue that neither of those (b)(1)(B) or (C) should apply.

And then my final objection is -- was the late addition to the PSR, and this is the use of a foreign device. Because of the way that that enhancement is drafted, the way that it references back to the access device fraud statute 1029, it's specifically referring to the obtaining of telecommunication services.

THE COURT: Look at the next paragraph after that, in the definition, and I think it gets you to one that says, "It provides access." I think that's where the probation is going to focus, and that's where I think y'all ought to focus.

MS. BARRON: But it still begs the question of whether it's telecommunication service, as that term is defined by statute.

THE COURT: Okay.

MS. BARRON: So I don't understand how this ATM machine, the frequency between the ATM machine and the bank, qualifies as telecommunication service under the Communication Act of 1934.

THE COURT: Yeah.

MS. BARRON: So those are my objections, Your Honor.

THE COURT: Okay. Let me say this: These are not

run-of-the-mill, easy objections in my mind. They're going to take a little bit of time, and they're going to take a little bit of evidence. And I know the Government is prepared to put on some evidence.

So I'm going to let the Government put on whatever evidence they're going to put on, and then when they do that and we're through with the evidence, then we can argue these piece by piece by piece. This is not something where I can just take them piecemeal because there are too many facts that have to be found on this.

So with that -- those are the objections I recall that you made. And so the Government can give me their response if they want, but it's going to require testimony, so -- you just -- I'm going to turn it over to the Government at this point.

MR. MORRISON: Judge, I would reserve my argument after the Government puts up evidence. So we would call at this time FBI Special Agent Matt Winn to the stand.

COURTROOM DEPUTY: Do you solemnly swear that your testimony in this case shall be the truth, the whole truth, and nothing but the truth, so help you God?

THE WITNESS: Yes, I do.

COURTROOM DEPUTY: If you could please state your name for the record and spell it.

THE WITNESS: Matthew Winn. M-a-t-t-h-e-w, W-i-n-n.

MATTHEW WINN

Whereupon, witness, having been duly sworn,

testified as follows:

DIRECT EXAMINATION

BY MR. MORRISON:

Q Good morning, Agent Winn -- or good afternoon.

THE COURT: No, it's morning still.

MR. MORRISON: Yes. It's still morning for 30 more minutes.

BY MR. MORRISON:

Q How are you employed, sir?

A I'm a special agent for the Federal Bureau of Investigation.

Q And how long have you been employed in that capacity?

A Twelve years.

Q And prior to working for the FBI, were you employed in law enforcement?

A Yes. I was a police officer in Manchester, New Hampshire, for five years.

Q And do you also have military experience?

A Yes.

Q What is that?

A I've been in the military. I've got over 22 years. I'm a lieutenant colonel in the US Army Reserve.

Q Okay. As your duties with the FBI, were you assigned to

an investigation in 2024 involving what we'll refer to here as ATM jackpotting offenses?
A Yes, I was.
Q And when were you assigned to that case? I don't mean the exact date, but what year?
A Sure. It was July of 2024.
Q Okay. And to make your testimony easier here today and go through events that you investigated, did you put together a PowerPoint presentation for the Court?
A Yes, I did.
Q Sir, I'm showing you what's marked for purposes of identification as Government's Exhibit 1. Do you recognize Government's 1?
A Yes, I do.
Q What is that, sir?
A This is a thumb drive containing the PowerPoint presentation that I prepared for today.
Q Okay. Does that contain a fair and accurate copy of that PowerPoint presentation?
A Yes, it does.
MR. MORRISON: Your Honor, the Government would tender at this time into evidence Government's Exhibit No. 1.
MS. BARRON: No objection.
THE COURT: It's admitted without objection.
(Government's Exhibit No. 1 admitted.)

BY MR. MORRISON:
Q Agent Winn, I'm going to go through this presentation and have questions for you as we go through it. Okay?
A Yes, sir.
Q On this first slide, modus operandi, can you explain to the Court how the jackpotting schemes worked.
A Yes. So in this case, what the crew, as I'll refer to them, was doing is they would go to an ATM at a financial institution. They had a skeleton key for the ATM because certain brands of ATMs use one key to open all the top halves of the ATM. So they would use that key to open what they refer to as a "top hat," which is the top part where the computer system is.

They would then install a computer device inside the ATM, and what they would do is they would remove the network cable that provided connectivity between the ATM and the financial institution's server. And they would plug that network cable into their device. And then they had another cable coming from their device which they would then plug into the ATM, effectively putting a man in the middle between the ATM and the financial institution's server.

They would then use a bank card to conduct a transaction, like as if they were a normal customer requesting money. The transaction would go from the ATM, through the device that they installed, to the financial institution's server.

Q Let me stop you there. Now, how was this transmitted? Was it used through the network in the ATM, or did they use what's commonly referred to as cellular pucks, devices?

A So there's a few things. So the communication was going through the cable, the Internet service provided to that ATM, the direct between the ATM and the financial institution. So that -- the message for the transaction was going through that system. However, at the same time, they were using Wi-Fi hotspots, like a cell phone Wi-Fi puck, that they would put typically on top of the ATM or inside the ATM.

THE COURT: What's a puck?

THE WITNESS: Sir, it's like a little device that provides Wi-Fi network over the cell phone service.

THE COURT: You're saying like "puck" because it resembles a hockey puck?

THE WITNESS: That's what they're commonly referred to, yes, sir. P-u-c-k. Like the hockey puck, yes, sir.

THE COURT: A hotspot is --

THE WITNESS: A hotspot. It's a hotspot, yes, sir.

THE COURT: I got that.

MR. MORRISON: It's a mobile hotspot.

THE WITNESS: Mobile hotspot. Cellular hotspot.

BY MR. MORRISON:

Q And these devices would be brought by members of the crew and placed on top of the ATM? They were not a part of the

ATM?

A That is correct. The crew would bring them, and they would put them either on top of the ATM or inside the ATM. And what that would do is allow the hacker, who was Venezuelan based, to access the device, like a little computer device that they installed inside of the ATM.

So while that computer device -- which I'm going to refer to as a "Raspberry Pi," if that's okay?

Q That's fine.

A The Raspberry Pi is intercepting traffic between the ATM and the financial institution's server, and at the same time, the Venezuelan-based hacker, who they refer to as "The Engineer," is using that Wi-Fi hotspot to remotely access the Raspberry Pi so that he can manipulate the message traffic between the ATM and the financial institution's server.

Q Prior to you testifying here today, I went over some of the objections to the presentence report in this case with you.

A Yes.

Q And one of the objections was that there was not the need for a hacker for these certain banks and credit unions because they had a lower-security network than your main branch bank, such as Wells Fargo or Bank of America. Can you explain.

A Yes. So that's not true. There was a need for a hacker. I think where there is still a little bit of confusion is

these bigger banks, such as Bank of America or -- that's a great example, Bank of America. They have modern ATMs, and they also have modern software to help prevent these types of attacks.

These smaller mom-and-pop-type financial institutions that were targeted by this crew did not have that advanced-level security. They still had security to prevent -- they had security, and that security had to be thwarted, but they did not have the advanced, higher-level encryption, newer machines like a Bank of America would have. So that's why the crew would be targeting these smaller mom-and-pop-type financial institutions. But, yes, a hacker was still needed and was utilized.

Q I'm going to jump ahead a couple slides, and we'll come back. Just here on Slide 5 of your presentation, which was taken directly from the superseding indictment, does this accurately list all the financial institutions that you identified or targeted by the hacking crew in which the Defendant here was a member of?

A Yes.

Q And how did you obtain the loss amounts?

A By speaking with the bank representatives.

Q Okay. And you said mom-and-pop-type organizations or banks. Was that commonly credit unions and smaller banks?

A Yes.

Q Now let me go back to Slide No. 4. Tell us what we're looking at here.
A So this is a depiction of the crew that we were investigating.
Q Is there a hierarchy in the crew?
A Yes. So in the top-left corner, you have what we are referring to as the hacking team. So we have The Engineer, who is the actual hacker, according to Ms. Tellez Duarte was Venezuelan based.
Q Let me stop you there. On December 10th, 2024, did you travel to New York City to place Ms. Duarte and her Codefendants in custody?
A Yes.
Q And did you have occasion to interview her on that day in New York City?
A Yes.
Q And that's a post-Miranda interview?
A Yes.
Q And when you interviewed her, did you ask her about the different members of the crew?
A Yes.
Q What did she tell you about The Engineer?
A She said The Engineer was a hacker who was based in Venezuela, that the proceeds of the jackpotting operations he received -- The Engineer and Cochi, who is depicted next to

him, they would receive 50 percent of the proceeds. The hacker was responsible -- the hacker would be -- The Engineer -- sorry -- who is the hacker, would be on a phone call with Cochi, and then Cochi would be on a separate phone call with the crew on the ground conducting the actual hands-on operation at the ATM. The Engineer would be relaying information to Cochi, directions for the crew as he's hacking the device, and then Cochi would relay that information to the crew.

She said that The Engineer did hack the ATMs and would hack the financial institution's software.

Q During your interview of the Defendant, did she have direct knowledge that The Engineer was outside the United States when he was doing this hacking?

A Yes. She told me he was in Venezuela.

Q And explain this chart, the hierarchy, please.

A Yes. So, again -- so the hacking team is The Engineer and Cochi. According to Ms. Duarte, and also according to our investigation, they are both Venezuelan based. They would -- again, Cochi would be on a WhatsApp multiparty call with the crew that was on the ground. We can see that. We have evidence of that. From statements from the Defendants, we know that Cochi would also be on a separate call with The Engineer as the jackpotting operation was taking place. So that's the hacking crew, or team.

And then you have the technical team. So we have two groups here. We have Guillermo Rene Tovar Camacho and Karen Campo Pax. That's a husband-and-wife team.

So Guillermo was running the crew on the ground and reporting back to The Engineer and Cochi. According to Ms. Tellez Duarte, The Engineer and Cochi actually had four crews in America and the one that we took down was just one of the four. So Guillermo was running this crew on the ground, and he was the -- him and his wife would be responsible for actually installing the Raspberry Pi device inside the ATM and then retrieving it after the crew stole the money from the ATM.

But in October of 2024, Guillermo and Karen returned to Venezuela, at which time we saw Keyderman Villamizar, which is Ms. Tellez Duarte's -- or was her significant other. We saw him then take on the leadership role of the crew. And he also became the installer of the devices, with Ms. Tellez Duarte being his partner in that. So she became, basically, his -- they moved up to become the technical team once Guillermo and Karen fled.

So in becoming the technical team, it was their responsibility to install the device and then withdraw it at the end of the operation.

In addition to that, Mr. Villamizar took on that leadership role that Guillermo left. You know, there was a

void when Guillermo left, and Mr. Villamizar took on that leadership role as well as the technical team role with Ms. Duarte.

And then down below that, we have what we call the cash withdrawal countersurveillance team, and you can see a handful of subjects here. So these are the folks that would basically conduct countersurveillance while the technical team was installing the device, and then this team would then go and actually run a bank card in the ATM and conduct transactions, withdrawing typically 500 to $800 at a time until the ATM was drained of its money, and then they would leave. The technical team would come back, retrieve the device, and then they would move on to their next target.

While the cash withdrawal team was conducting withdrawals, other members of that same team, because there would be multiple cars with multiple people, would be conducting countersurveillance for them, just to notify them that if a law enforcement officer showed up or if a legitimate bank customer showed up. Because while they're conducting the jackpotting operations, they would oftentimes leave because a real customer showed up behind them, and so they would leave and let the real customer run their transaction, and then the crew would return and continue withdrawing money.

Q And when you want me to go to the next slide, just say, "Next slide."

A Next slide.
Q Before I do, let me ask you something real quick. On one of the cash withdrawers you have identified as Esteban Tellez Herrera. Who is that in relationship to the Defendant here?
A Yes. That's her son.
Q Okay. And was he a member of the same conspiracy?
A Yes, he was.
Q And that's her son who was going to be included on the superseding indictment; however, he tragically died in an automobile accident?
A That's correct.
Q Okay. I'm now going to Slide 6. Based on your investigation, did this Defendant receive a financial benefit from her participation in the jackpotting crew?
A Yes, she did.
Q And what was that?
A So she -- as I mentioned before, Mr. Villamizar was her significant other. She resided with him in New York City, in the Queens area of New York City, and they resided at that address for two years prior to us arresting them. The rent for their apartment, which was, in my opinion, a very nice apartment, was $6,000 a month. They also had lavish furnishings in their apartment.
Q And you physically went to that apartment?
A Yes. Mr. Villamizar put a $40,000 cash down payment on a

2023 Cadillac Escalade in October of 2024. In my interview with Ms. Tellez Duarte, she told me that the proceeds of the jackpotting were used to put that down payment down. So he was using the illicitly gained funds from their criminal activity in this case towards the $40,000 down payment on a car.

Ms. Duarte had a 2024 BMW 430 that she put a $24,000 cash down payment on. So between her $6,000 a month rent, her lavish lifestyle, and then significant cash down payments on cars -- and she didn't have a job, um --

Q And you're aware that in her pretrial service report, she stated that she had been in the US since 2014 and never had employment in the US?

A Yes. That's my understanding.

Q Okay. What does the next slide show, sir?

A So this is a video that she posted to social media of her apartment in New York, just to kind of give you an understanding of how nice it was.

Q So would she show off some of her designer clothes and items on Instagram or social media?

A Yes. She very frequently posted pictures of herself and her activities, dinners out, outings out with Mr. Villamizar, and, obviously, her very nice apartment.

THE COURT: Hold on a second. Go back to the beginning of this.

MR. MORRISON: Yes, sir.

THE COURT: Magally, read this to me on this screen.

THE INTERPRETER: You have something that really caught me po --

It's a saying.

-- and we are fixing the new little house.

THE COURT: Okay. It's going to keep going. Tell me what it says.

THE INTERPRETER: Okay, sir.

This is "A Party Night."

THE COURT: Party night?

THE INTERPRETER: Yes. It's a song. It's a song, and that's the lyrics of the song.

THE COURT: Okay.

THE INTERPRETER: I want to confess that I want to get close to you. Fixing our new house. And I'm sorry, but I'm going to steal a kiss from you to remember this moment, and we are dancing, and later a little --

You're going too fast.

MR. MORRISON: I'm sorry.

THE INTERPRETER: I need to read and switch it in my brain.

MR. MORRISON: Okay. I'm going to start it right there. Tell me if I need to stop.

THE INTERPRETER: In my mind I want to get close to

you, and I'm so sorry (inaudible), but I'm going to steal a kiss from you that remind you of this moment, dancing around and then a little going around again.

THE COURT: Okay.

THE INTERPRETER: That's it. It's a song. Those are the lyrics.

THE COURT: Okay. Thank you very much. Sorry. Agent Winn, I wanted to -- that's going to bother me if I don't know what that says.

THE WITNESS: Yes, Your Honor.

BY MR. MORRISON:

Q Okay.

A So this is a photo from the actual day when we went in there on December 10th to arrest Ms. Duarte and Mr. Villamizar and conduct a search of the apartment.

Q And obviously, it's Christmastime, December?

A Yes, sir.

Q What is this?

A This is their family room. So the video kind of gave it a pretty good general overview, and then it showed the bedroom and things like that. But this is showing how it was when we went in there. You can see there's a big-screen TV. Pretty much all the bedrooms -- I think, actually -- yes, all three bedrooms had extremely large big-screen TVs in them as well. Obviously nice furnishings.

Q And was the Defendant and Keyderman Villamizar the only occupants of this apartment?
A Yes.
Q So this was just their residence?
A Yes. This is their kitchen.
Q What is this?
A So this is a copy of the lease. You can see I've highlighted, um, it's in the name of Keyderman Villamizar. It shows that -- right here it shows the date they signed the lease, which was December 1st of 2022. So they had been in there for two years when we arrested them. And then what I've got highlighted down here is $6,000 a month for rent. So over the course of two years, that would have been $144,000.
This is Mr. Keyderman's 2023 Cadillac Escalade that he put the $40,000 cash down payment on. That was parked in the driveway of their apartment.
Q When you executed the search warrant, it was parked there?
A Yes, sir.
Q Okay.
A And this is the -- so we issued a grand jury subpoena to the company where they bought the cars. This is some of the return information on that. Specifically, it shows when Mr. Keyderman bought that car, October 15th of 2024. He paid $84,000 for it and put a $40,000 cash down payment on it.

And here is his name, showing that he is the buyer.
Q Okay.
A And this is Ms. Duarte's vehicle, which was found -- so she actually had two residences. She had the apartment in Queens, New York, and then a family home that she also resided in outside of Charlotte, North Carolina. So we executed a search warrant at that residence as well. She was not there, as she was in New York.
This is her BMW 430, which is a 2024. It was at the house, her house, in North Carolina.
Next slide, please. And this is the paperwork from the dealership for her car. So here we see her as the buyer. We see her purchase price of 46,900 and her cash down payment of $24,000.
Q What are we looking at here, sir?
A So here are some pictures from social media for Ms. Tellez Duarte and Mr. Villamizar on the left. We've got some -- what appears to be gold. In the middle is a picture of Mr. Villamizar and Ms. Duarte in Times Square.
Coincidentally, we used this photo to help further our case because this car was actually one of the cars used at one of the incidents in Georgia, which helped us link that crime to them. But it just goes to show that they are, you know, kind of showing off their situation in Time Square and posting this on social media. And on the right you've got just bulk

cash that was taken in their -- we believe based on the countertop -- because there's actually -- the far right video with the money is a still shot of a video.

Q Okay.

A And in the video, the person we believe to be Mr. Villamizar is talking and saying something to the effect of this money is to pay his rent. And it's, obviously, bulk cash. And based on the floor and the countertop, we believe this was filmed in their New York City Queens apartment.

Q Okay.

A Here we have a couple of videos Ms. Duarte posted on social media. On the left it appears to say, like, "Happy Anniversary." She's out to what appears to be a pretty nice dinner in New York.

THE INTERPRETER: Happy Anniversary. And "Thank you so much. I love you."

THE COURT: Hold on. Let me hear this. I thought she was talking to me again. I'm sorry. Go ahead.

THE INTERPRETER: That one is "Happy anniversary." And the other one says, "Keyderman, thanks a lot 10,000 times. I love you."

BY MR. MORRISON:

Q Okay.

A So the video on the right, it's just -- obviously, it's just Keyderman, which is -- on top is the name of -- first

name of Mr. Villamizar, her significant other. And then based on the fact that she's saying, "Thanks a million. I love you," we believe that he gave her this gift of a nice bottle of perfume. It just kind of goes to show that she's not destitute. She's living a pretty comfortable lifestyle.

Q Okay. If we can go to the next slide. Let's talk about what your investigation showed was Ms. Duarte's involvement in the conspiracy.

A Yes. So throughout the course of our investigation, we determined that Ms. Duarte served multiple roles in the crew. She was a driver. She took videos and pictures of banks and ATMs which she then shared with other members of the crew.

Q Let me stop you there. What was the purpose of taking videos of ATMs and then sharing it with other members of the crew?

A Yes. I think it probably served multiple purposes. One, so that they could see what they were about to go up to so they would know the layout of that bank, that drive through, the ATM drive-through. So when they go up to cash out or go up to install the device, they can basically have a reconnaissance of the target. But I think more importantly, what it was was to send back to The Engineer, via Cochi, so that The Engineer could see what the ATM looked like. Because I would say most of the videos were, specifically, close-up videos of the ATM.

So I think that, you know, based on our investigation, talking with experts in the field and talking with the Defendants, that these videos were being sent back to The Engineer in Venezuela so he could effectively hack those ATMs.

Q And that's what I want to get into now, is the Raspberry Pi. The Raspberry Pi is introduced into the ATM?

A Yes.

Q And are they on a phone call with Cochi, who is the intermediary, the middleman between the crew on the ground and The Engineer?

A Yes.

Q Okay. And when they introduce this Raspberry Pi, what does it do in the machine?

A Sure. So what it does -- and they're on a call. I will specify it was -- based on our investigation, it was always actually a WhatsApp call.

Q What's significant about WhatsApp?

A Which is significant because WhatsApp is an end-to-end encrypted application. So that call is encrypted. So I think that that was utilized as another security mechanism and kind of a sophisticated technique by the crew to have a secure call between themselves and the hacker and Cochi back in Venezuela.

Q Let me stop you there. In our drug investigations with drug -- Mexican-based drug cartels, is WhatsApp the preferred method of communication?

A Yes, it is; for the same reason I just stated. It's secure and difficult, if not impossible, for law enforcement to intercept.
Q Now, when this Raspberry Pi -- what did you learn? When it's inserted into the ATM, what does this device do?
A Yes. So what it does is it intercepts all message traffic between the ATM and the financial institution's server.
So, specifically, what they would do is the crew on the ground, after installing the device, the Raspberry Pi, would run a bank card like a legitimate customer and then try to run a transaction for a withdrawal of, say, $500. That message traffic, the request to do that withdrawal, would go from the ATM through the Raspberry Pi to the financial institution's server. The financial institution would deny that transaction and send a denial message back to the ATM. However, the Raspberry Pi would intercept that message, and The Engineer would hack the system to change that message to an approval message. So what the ATM actually receives is an approval message to dispense that $500.
Q Did the Raspberry Pi also work as what's commonly referred to as a "skimmer," which assisted The Engineer in figuring out what the code was to do an approval message?
A Yes. So it -- it allowed The Engineer to see all the message traffic between the ATM and the financial institution,

which then he would manipulate those messages and the coding of the messages to tell the ATM to then send -- or take a denial message and change it to an approval message. So it would do that. But it served two purposes. That was the first. It would also skim legitimate bank customers' information.

So I know this from talking with multiple Defendants, including Ms. Duarte told me this, as well as speaking with experts in the ATM field, that this is their whole job, is to counter ATM skimming and jackpotting. Those Raspberry Pi's, once installed, if a legitimate customer comes and uses the ATM with that device installed inside, they can skim -- "they" being the crew and The Engineer -- can skim that customer's information. They get that customer's banking information. They know how much money is in their bank account. They know how much money they just withdrew during that transaction.

And according to the experts, but also from Ms. Duarte's interview, she told me that sometimes they would actually use legitimate customer's information in furtherance of the jackpotting.

And by that, after they installed the device, they would typically wait one to two hours to see if law enforcement was going to respond. Because when they open up the top hat of the ATM, it will send an alarm. So they would actually tape down the alarm. When you open it, there's like a little

spring that says, basically, it's open. So they would tape that down, but they did trigger it once. So they would close it, lock it up, and leave for an hour to two hours and watch to see if law enforcement was going to come.

Well, during that time, legitimate customers can use the ATM. Well, if they did, according to Ms. Duarte, The Engineer would capture that information and could then use that information to manipulate into approval messages for the transactions that the crew then ran afterwards.

Q You listed here that Ms. Duarte assisted with the installation of the devices installed in the ATMs. Where did you glean that from?

A So we have surveillance footage from most of these thefts, these jackpotting incidents. And in some of those videos, we see, one, her driving Mr. Villamizar, and also in one instance, at least, she drove Guillermo while they were installing the devices. And we have video of her handing devices to them so that they could install them in the ATMs.

Q And she participated in WhatsApp calls. How do you know that?

A So two ways. We had pen registered tap trace devices on their WhatsApp account, so we could see who was participating in these calls through the pen register information. And then also we conducted searches of their cellular telephones and also some iCloud accounts, and through that, we can also see

evidence of the calls.

Q And what was the evidence that she sent and received bank locations for the crew to target?

A So, again, in searching iCloud accounts and phones, in this case, specifically, Ms. Duarte's phone and the iCloud account of Ms. Karen Campo Paz, which was Guillermo's wife. We see messages back and forth between the two ladies and also with Ms. Duarte and some other folks, sending out pictures and videos of the ATMs and the banks.

Q Okay. And she kept a ledger?

A She did. I'm sorry. I talked about the videos. Then she also was sending back and forth bank locations too. And I've got some more slides that kind of go into the specifics on that.

Q Okay. We'll get into that.

A The ledger. I have a slide specifically for that.

Q Okay. We'll get to that.

A But she did keep some ledgers as well.

Q What about coordinating a defense attorney for crew members? Let's talk about the events that occurred in Virginia. Was that November?

A Yes, sir.

Q Tell us about that.

A So in October and November of 2024, the crew went down to Virginia on a couple of occasions, specifically kind of in the

Harrisburg/Broadway, Virginia, area and conducted several jackpotting operations. We were actually monitoring the pings on several subjects' phones. And so when I saw them go down there one evening, I reached out to the FBI in that area as well as local law enforcement, who were able to go out and identify that they were targeting a bank and basically disrupt them. They were able to identify and arrest two subjects. Ricardo Lopez and his son, Brayan Ochoa, were both arrested on November 2nd, 2024.

Q Were they in the act of jackpotting?

A Yes. The bank was actively being targeted by the crew for jackpotting. The device was still inside the ATM. When law enforcement went to the bank, it basically scared off the crew, but Mr. Lopez and his son, Mr. Ochoa, were still in their countersurveillance position across the street at a dollar store. I gave the police officers kind of a description of what we would be looking for: out-of-state license plates, a car nearby watching the bank they used that information and saw those two subjects leave in a car with out-of-state tags that did not come back to the vehicle that they were on, conducted a traffic stop, and then gave me the names. And I knew those people already as subjects of our investigation. They were able to bring local charges on them. So at that point, those two subjects were arrested.

And then Ms. Duarte -- we know from listening to jail

calls between Mr. Lopez, who is the father that was arrested on that -- him speaking on recorded jail calls, we know that Ms. Duarte was hiring an attorney to represent Mr. Lopez and Mr. Ochoa for their involvement with the jackpotting crew and their subsequent arrest in Virginia.

Q Okay. Tell us about the Defendant's WhatsApp participation.

A So in reviewing the WhatsApp data, we know that Ms. Duarte communicated via WhatsApp with members of the crew prior to and/or during at least 14 jackpotting incidents, which I've listed here in this PowerPoint slide. So that's at least these ones. And I can also say that she was physically present, based on our other evidence, at those 14 incidents.

Q Okay. And just so I'm clear, when you say she's participating in the WhatsApp calls, that is the calls with the crew members on the ground as well as with Cochi in Venezuela?

A Yes.

Q Who is in simultaneous contact with The Engineer?

A Correct.

Q What about the bank locations, sent and received bank locations?

A So she sent or received bank location information for the targeted banks and credit unions prior to at least five jackpotting incidents that I've listed here. And you see four

bullets, but that's because the third bullet, there's -- they hit two branches, the Rockville and Silver Springs branch of that particular financial institution on the same day. So there's five. And Ms. Duarte was physically present for each of those.

And when I say "bank location information," what it is is basically Google Maps, pins or Google Maps. Like, if you search a bank on Google Maps, you can share that location via text with somebody else. That's what they were doing, which leads me to believe that they were coordinating to go -- "this is the next bank we're going to. Here, I'm sharing the pin for it." So then the crew could then drive to that next location.

Q What are we looking at here?

A So as I mentioned previously, Ms. Duarte sent or received pictures and videos of banks and credit unions and specifically focusing on the ATMs. So she sent, received, or possessed these videos and/or pictures for at least the 12 jackpotting incidents that I have listed here.

And on this one, I've actually spelled it out. Like here you can see Ms. Duarte sent it to Ms. Campo Paz. So for the most part, you'll see, in the parentheses, Ms. Duarte was sending these images and videos out. So she was the one that was taking them. And we know this from searching her phone as well as searching Ms. Campo Paz's iCloud account.

Q And what are we looking at here?
A So I just pulled two examples. These are actually videos, but I just did still shots of the videos. And so on the left here, we have Shore United Bank. She actually had multiple videos of this ATM. You can take note of this little part right here. So you can see her hand and her phone in the reflection. That would be significant in a later slide where you actually have a picture from the ATM viewing her and recording her making this movie.
And on the right is the Union Bank up in Vermont, which Ms. Tellez was a driver and assisted Mr. Guillermo Tovar Camacho in installing the device in the ATM at that bank.
Q And these videos were taken off of Ms. Duarte's phone?
A Yes.
Q During the search?
A Yes.
Q Okay.
A So this slide outlines the instances in which we know Ms. Duarte drove during the jackpotting incidents. So as I mentioned, she drove at least once in Jericho, Vermont, at that Union Bank for Mr. Guillermo Tovar Camacho and then on at least three other instances for Mr. Villamizar. And, again, I only listed ones where I could tell, definitively, that she definitely drove based on surveillance footage.
Some of the -- for example, the Del-One Credit Union,

they only -- they hit four of those, and they only had video for one because the time had lapsed. And there are other instances where you just can't see exactly who the driver is. So there could be more, but these four for sure.

THE COURT: How do you know that, sir?

THE WITNESS: Yes, sir. So that's the next slide.

BY MR. MORRISON:

Q Okay.

A So in some instances, she actually identified herself during the interview. Specifically, this picture right here, this is the Union Bank in Jericho, Vermont, in which she drove Mr. Tovar Camacho. And you can see right here she's handing him the device that he then installs in the ATM.

Q Let me stop you there. During her interview, she self-identified that person in the black hat as being her?

A Yes.

Q Does she get out of that vehicle, and when the ATM is open, is she with Mr. Villamizar as they install the device?

A So in this case, it was Mr. Guillermo Rene Tovar Camacho. But, yeah, you can see she's outside the car right now. And she gets out of the car, I believe, a couple times in this one.

There's also another instance at a Penn East Credit Union, which was in Erie, Pennsylvania, where she's outside the car as Mr. Villamizar is installing the device inside the

ATM.
Q Okay.
THE COURT: Which one -- I'm sure, Mr. Morrison, you're going to get to it. I want to know which one of these pictures in her response, in her objections -- where she says that's Campo Paz.
MR. MORRISON: We can talk about that now, actually, because we don't have the photo in here.
BY MR. MORRISON:
Q I showed you the objections to the PSR, and there is one in the vestibule of a bank in which a male -- a Hispanic male is all we know -- was taking money out of the ATM and placing it into the female's purse. Were you able to identify, definitively, if it was this Defendant or Karen Campo Paz?
A No.
Q Tell the Court why.
A So I don't believe it was Ms. Campo Paz because she comes into that vestibule four minutes prior to the other woman, who was potentially Ms. Duarte -- four minutes prior, wearing a completely different outfit: a sweatshirt, shorts, and a different pair of shoes or sandals. Not slides, like sandals where you actually have to take a strap off of to take them off. And then she's in there for a couple minutes and then leaves. And then within a minute or two of Ms. Campo Paz leaving, the other woman comes in wearing a completely

different outfit, appears to be a different body frame, larger than Ms. Campo Paz.

THE COURT: But is it your assumption that because it's that level of the hierarchy, it's got to be one of those two? Because I suspect that's what Ms. Barron is going to ask you in a few minutes anyway.

THE WITNESS: Sure. Yes, sir, Your Honor. The only women that were operating with the crew at that time that we know of -- there was three. Ms. Campo Paz -- and, really, at that time, there was two, Ms. Campo Paz and Ms. Duarte.

That second woman matched the physical description of Ms. Duarte. And based on the fact that Ms. Campo Paz had literately exited a minute or two prior -- and I don't think she physically could have done the wardrobe change that fast -- and the fact that the body appeared to be different, that's how I came to that conclusion that that was very possibly or likely Ms. Duarte.

THE COURT: I just think that's going to -- I mean, we've just got to decide that because that's going to impact acceptance of responsibility, depending on how the Court sees that.

BY MR. MORRISON:

Q And these other photographs, if you can explain those.

A Yes. So this one right here, this sweatshirt that she's wearing, she wore that in multiple thefts. The car that she's

driving is a black Ford Explorer. It's the same one right here. And you can see there's duct tape right there on the windshield and up here on the windshield. We found that car. Ms. Duarte's belongings were in that car when we found it parked on the street in New York City near her apartment.

THE COURT: Any significance to the duct tape?

THE WITNESS: I think it was just a bad car that was falling apart and they put some duct tape on it. But it was significant to us because they used it over and over again. And you don't see too many Ford Explorers with the exact same duct tape on the windshield.

THE COURT: I get that.

THE WITNESS: So it made it very distinct.

THE COURT: Okay.

BY MR. MORRISON:

Q Okay.

A These two pictures are both from the same instance. I told you I didn't remember the previous photo. Well, this right here with her with the phone in her hand is her taking that video which I had a still shot of.

Q I'll go back.

A Yeah. One more. Right here.

Q Right here?

A You can see the phone right up there.

And then the picture below it, she dropped the phone so

you can see it.

Again, I worked this case and watched over -- they hit over 50 financial institutions. So I became very familiar with the subjects and what they look like.

And, again, she self-identified during her interview for multiple instances. This one right here on the bottom, now you can see -- you can't see her face in this video, but you can see she's wearing this white hoodie with the two black stripes down the sleeves, driving this black Ford Explorer.

Well, the police -- I called the police while they were doing this one and tried to get them stopped, and the police disrupted them but didn't catch them, but they did watch this car before they really knew its level of involvement. They watched it pull into a local restaurant. So after the fact, with hindsight, knowing that that car was involved, they went and pulled surveillance footage from that restaurant, and you can see Ms. Duarte go into that restaurant wearing that hoodie and after getting out of that car, which the police witnessed, and order something with no mask on or nothing. You can see clear as day it's her.

Q Let's talk about her search history on her phone. What did you find?

A So we found some search history. It's undated, but you can see some of it is in English. On the left is what she actually searched. On the right is some translations we put

in. I apologize for not -- improper punctuation of not capitalizing things, but we kept it consistent with how she searched for it.

Q Okay.

A So she's searching for photos of North Georgia Credit Union, Toccoa. Well, that was one of the banks that they hit when they came down to Georgia in July.

She is searching North Georgia Credit Union. Again, they hit two branches of that, one of them being in Hartwell, which is in the Middle District of Georgia. And all the search history, basically, talking about -- she's looking to see if there's any news about the fact that they hit these two banks in Georgia, both of which were North Georgia Credit Union branches.

Q Okay.

A Which I can tell you from having worked a lot of robberies, it's very common for people to search their criminal activity after they've committed it to see what kind of surveillance video is out there that the police are putting in the media. Does the bank even know that they were victimized? Then, basically, trying to understand what is known about the subjects that committed that crime. So it's a pretty common technique used by subjects who commit crimes.

Q Let's talk about the ledger, which I included in my motion that I -- the notice I filed last night.

A Yes. So in searching Ms. Duarte's cell phone, which we seized on December 10th in search -- or pursuant to a federal search warrant, we found a ledger -- actually a couple of ledgers on her phone, but they were all related to the Del-One Credit Unions which were targeted by the crew for jackpotting on September 22nd and September 23rd. They later went back, I think, like a week or two later and hit another one again. But the ledgers pertain to the three instances on September 22nd and 23rd.

There was ledgers that had breakdowns for these specific instances, and then you can see on the right this screenshot here, which is a note in her iPhone, is kind of a cumulative ledger for all three jackpotting instances.

And what we see here is -- in the very bottom -- it's probably hard to see. We have some translations.

But, basically, "gastos" is expenses. So they've listed at the top their expenses for this trip. And they say card -- "tarjeta" is card -- $1,000. We know that they used prepaid -- based on our interviews with the subjects, we know that they used prepaid bank cards like ones that you could go buy at Kroger or CVS to test the ATMs. So we believe that that's likely what that is referring to.

Hotel. Pretty self-explanatory. They incurred $250 cost in hotel fees. And then the total of those two things is $1,250.

We believe this next line is saying that there was four people. So per person, that was $312.50. So that's the expenses for the trip.

And then you can see this Del-One, there is three branches they hit in Delaware. So Delaware, you know -- across two days, it would make sense that they stayed in a hotel since they all lived in New York City.

So then we go into "Total Cuentas," which "cuentas" is accounts. So "total retiros" is total withdrawals.

And, you know, other countries, they use the decimal point instead of a comma when they're talking about big numbers. So this says $257,800 is the total withdrawals. And then we have total gastos, which would be total expenses as outlined, you know, up here, is $1,250. So that's kind of the breakdown. They made $257,800 by withdrawing, and they had $1,250 in expenses.

Well, "Ingeniero" is The Engineer. He gets half, which 128,900 would be half. "Naye," which we know through interviews of the subjects that was the nickname for Keyderman Villamizar -- Naye gets 29,200 minus his expenses of $312.50 for a total of $28,880.

"Guillermo" is Guillermo Rene Tovar Camacho. So when Guillermo -- he was still in the United States at the time of this incident, so he was involved. And the same thing: He got the same amount as Keyderman, minus his expenses, for the

same total as Keyderman.

"Karen" is Karen Campos Paz. That's Guillermo's wife. She would assist Guillermo with driving while he was installing the Raspberry Pi's inside the ATM. She got a lesser cut of 5,840.

"José" is Guillermo's brother, which is Guillermo Jose Tovar Camacho. You can see he got $12,100.

"Oliver," which is an uncharged codefendant, is -- we believe to be the son of Juanileydis Vasquez. And Juanileydis Vasquez, who was on our initial list of the crew members, is the wife of Ricardo Lopez, who was arrested in Virginia. This is their other son. The son Brayan was arrested with the dad in Virginia, but Oliver was not. We believe Oliver was involved in this and, obviously, played a significant role because he got a significant amount of money. And you can see he had expenses, which would lead us to believe he was there on the ground.

And then most importantly for this hearing is right here, "Karol." So "Karol" is Karol Tellez Duarte, the Defendant. And you can see she made almost as much money as Guillermo and Villamizar, making $26,280, minus her expenses, for a total of $25,960. So she claimed to me in the interview that I did with her that she was not paid for her involvement in this scheme, but you can see in her own ledger that she created in her phone she's claiming that she received $25,960 just from

these three jackpotting operations at these three branches.

And I'll also note the total that they got, the $257,800 is -- that's her figure. That is within $1,000 of the figures reported by the banks, the culmination of the three. So it's accurate.

And obviously, this ledger was created by Karol on her phone on September 23rd of 2024. They hit these banks on the 22nd and the 23rd. So based on the one she created, she created it after they hit that third bank to have all that information.

Q Based on your investigation, would an unwitting party be able to create a ledger such as that?

A No. Nor would I think that they would credit themselves with receiving $25,960 of the proceeds.

And I'll also note, as mentioned in my slide here, that the timing of this jackpotting incident and when they made all this money was within weeks of when Mr. Villamizar and Ms. Duarte made those cash down payments on their Cadillac Escalade and BMW 430.

Q Let's now talk about Oliver. Tell us what this slide is showing.

A As I mentioned, "Oliver" we believe to be Oliver Ochoa, which is the son of Juanileydis Ochoa Vasquez and Ricardo Lopez, both indicted subjects in this case.

We seized Ms. Vasquez's phone, and when we downloaded it,

it showed that on October 5th, which is when the crew was up with Ms. Vasquez in Maine conducting a jackpotting operation, Ms. Vasquez had a boyfriend on the side and would constantly text him and would tell him what she was doing. And she mentioned that she was on a trip up in Biddeford, Maine, and that her and Oliver, which we believe to be her son Oliver, were on that trip as well and that the Colombian had brought them there in her car and paid for all of Oliver's expenses so he could get in on the winnings too.

Q Was there one Colombian in this jackpot crew?

A Ms. Duarte was the Colombian that we believe she's referring to because even in Ms. Vasquez's phone, she had -- the way that she saved "Karol" in her phone was something to the extent of "Karol the Colombian."

Q Okay.

A So this leads me to believe that what -- the assessment of what we're looking at here is that Ms. Duarte was now shepherding Oliver into the conspiracy and assisting him by paying for his expenses, driving him, and allowing him to become a part of that conspiracy so that he could start to make money off of this.

THE COURT: And what did he get from the previous cut?

THE WITNESS: 25,960, the same as her.

THE COURT: So he got a full share of that half,

basically?

THE WITNESS: Pretty much, sir. Because you can see Naye, which is Villamizar, and Guillermo got a little bit more, but those were the two higher-lever, higher-ranking people.

THE COURT: And José is who, again?

THE WITNESS: So José is Guillermo's brother. His name is Guillermo José Tovar Camacho. It's very confusing because the one who I'm calling Guillermo is Guillermo Rene Tovar Camacho. So their names are identical, minus one of their middle names.

BY MR. MORRISON:

Q And is it fair to say that José was a low-level, just-cash withdrawer?

A Yes. He was a -- yes. He was casher. According to Ms. Duarte -- I don't know if it's true. She says that he did take on a bigger role after Guillermo fled with Ms. Campo Paz. But it's our assessment from the investigation that it was clear that Mr. Villamizar took on the leadership role and Mr. José appeared to report to Mr. Villamizar.

Q Okay. Let's talk about this Defendant and what she knew about The Engineer's capabilities from Venezuela.

A Yes. So after Mr. Lopez and his son, Mr. Ochoa, were arrested on November 2nd while jackpotting in Virginia, as I mentioned, Ms. Duarte was retaining counsel for those two

individuals for their defense. But we also know that the wife and mother, Ms. Vasquez, contacted Ms. Duarte and asked if The Engineer could erase everything on Ricardo's red cell phone. So multiple phones were seized from Ricardo Lopez at the time of his arrest, including a red Apple iPhone. And his wife, Ms. Vasquez, wanted The Engineer to erase that and was consulting Ms. Duarte to see if that was possible.

Ms. Duarte advised that The Engineer could not do that unless Ricardo had the phone in his hand to give some permissions to The Engineer, which I'm not an expert on cell phones, but usually when you're wiping them, there are instances in which you would have to press certain things on the phone.

But, again, the point of this is just to go to show that Ms. Duarte is, obviously, heavily involved in this conspiracy. In addition to retaining counsel for them, she's working with the wife to try to -- she's advising, one, on the capabilities of The Engineer, and they're also discussing, you know, potentially destroying evidence of a crime.

Q Okay. And you already discussed hiring the attorneys?

A Yes.

Q Let's talk about what happened at the end of this investigation in South Carolina.

A So on December 7th and December 8th of 2024, just a few days before we arrested the subjects, the crew actually came

down to South Carolina. And Ms. Duarte was actually at her home in North Carolina, outside of Charlotte, at the time. She did not come with the crew to South Carolina.

Q Her second home?

A Her second home, yes. The crew targeted United Community Bank, four branches. They started in Columbia and then moved out to Greenville and the area around Greenville. And they hit three banks between December 7th and December 8th. And after the third bank was hit -- and we know this from an interview with one of the subjects who was a member of the crew who was arrested during these jackpotting incidents. After they hit the third bank, Ms. Duarte traveled from her home outside Charlotte down to South Carolina to meet with Mr. Villamizar and José, who gave her the proceeds of those first three jackpotting incidents at those first three banks.

She then left, went back to her home in Charlotte -- outside of Charlotte. The crew then hit the fourth bank in South Carolina. They were interdicted by police. Two subjects were arrested. Not Mr. Villamizar. He then called Ms. Duarte. And she told me this during her interview. He called her and said, "Come rescue me." And she went down and picked him up in the Charlotte area and drove him back to her house.

THE COURT: Wait a second. He was in South

Carolina. You said "Charlotte."

THE WITNESS: Yes, sir. So he was in South Carolina. He drove up to Charlotte and then abandoned the vehicle that they were using, because they brought two cars down for this operation in South Carolina.

And, like I said, they hit four banks over two days. They were using a van, a Honda Odyssey, and a Ford Escape, I think it was.

Two individuals who Mr. Villamizar recruited not too far prior to the incident were arrested. They were withdrawing money from the ATM. Mr. Villamizar and José were in the van, and they fled and drove up to Charlotte, abandoned the car, and then Ms. Duarte went and picked him up. But this was after she did drive to South Carolina to pick up the money.

THE COURT: That's what was confusing me, was just that --

THE WITNESS: I apologize. She made two trips.

THE COURT: Right. You said in the -- I think Mr. Morrison said in his response there was cell phone data, pings, that showed her traveling to Charleston or wherever in South Carolina?

THE WITNESS: Near the Greenville area; yes, sir.

THE COURT: And then going back. That corroborated that part of her interview in the 302?

THE WITNESS: Yes, sir.

THE COURT: Okay.

BY MR. MORRISON:

Q And, lastly, what are we looking at?

A Just some photos of some of Ms. Duarte's travels. So you can see she took a trip to Universal Studios and to the beach with -- this is Mr. Villamizar right here.

And then if you go to the next slide, she's going to Yankees games. She actually had a lot of photos from different Yankees games. Posing in her nice apartment. And then again, some more photos from Time Square.

The point of this is just to show that based on her lifestyle, I think it's pretty evident that for somebody who is not -- doesn't have employment, obviously has the funds and the means to live a pretty comfortable lifestyle.

Q Thank you, sir. Hold on just a second. I might have one more thing. No. Thank you.

THE COURT: Ms. Barron.

MS. BARRON: Thank you, Your Honor.

CROSS-EXAMINATION

BY MS. BARRON:

Q Good afternoon, Agent Winn.

A Good afternoon.

Q Since we're staring at it, have you ever been to Yankee Stadium?

A No, I haven't.
Q I understand there's evidence of a lavish lifestyle. But that's about a $50 ticket; right? Wouldn't you agree? I mean, it's in the nosebleed section.
A I don't know. I'm not sure what they charge for a ticket.
MS. BARRON: I don't need the slideshow anymore.
So you can take that down, if you don't mind.
BY MS. BARRON:
Q So most of what you said is really not in dispute. Most of what you testified to, I don't really disagree with.
You know, I agree they lived in a lavish apartment. Not my esthetic, but it looks very expensive. And I know she didn't have a job.
But I do want to focus on a few things that you mentioned. I want to start with this hacker. If I'm remembering your testimony, you said that when you interviewed Ms. Duarte, that she said that she knew there was someone hacking in from Venezuela. Do you remember that testimony?
A Yes.
Q Okay. You drafted a 302 in this case; right?
A Yes.
Q Of your interview with her?
A Yes.
Q And it's a six-page 302; right?

A Yes.
Q It's very detailed?
A It was a multihour interview. I would say that I hit the high points in the 302. In the preamble to 302, it specifically says that the interview was recorded and the true words spoken are captured on the recording. So I did try to hit the -- it was an outline.
Q Right. I understand. And what you did in that outline was identify the roles that everyone played; correct?
A Yes.
Q The setters?
A Yes.
Q The removers?
A Yes.
Q I don't think you used the term "money laundering," but you talk about the money going back to Venezuela and to other people; right?
A Yes.
Q And you identified all the players?
A I identified the players that she spoke about.
Q That "she"?
A Yes.
Q Fair point. And nowhere in that 302 did you mention that she told you someone was hacking in during these operations from Venezuela, did you?

A I think in the 302, it does reference the fact that the hacker is -- The Engineer is the hacker who is Venezuelan based.
Q Well, I was going to point you to that, and I can give it to you if you need a copy of your 302.
A That would help.
Q Thank you.
MS. BARRON: Your Honor, may I approach?
THE COURT: Come on.
BY MS. BARRON:
Q And, Agent Winn, I'll direct your attention to the bottom of page 2. And let me know when you've had a chance to read it.
A The bottom of page 2?
Q I think it's the bottom of page 2, the last paragraph there.
A Okay.
Q And in your memorandum, you mention that there was a person named an Engineer, name unknown, who was a Venezuelan-based hacker; correct?
A Yes.
Q So that's how it's described?
A Well, on page 2, in paragraph 2, it says, "The Engineer was responsible for hacking into the financial institution's system."

Q Okay.
A And in the previous paragraph, it says that he's Venezuelan based.
Q Okay. I got you. That was my misreading.
So I want to talk about the direct payment. So I understand that this investigation went on for many months; right?
A From the time I opened it until the time of arrest was about five months.
Q Okay. And I assume that you subpoenaed bank records?
A Yes.
Q Okay. And did you subpoena Ms. Duarte's bank records?
A Yes.
Q Okay. And did you see in those bank records evidence of large transactions going in after all of these thefts?
A It's been a long time since I've looked at the financial records. I don't remember off the top of my head anything glaring of like $50,000. But I can't say with certainty.
Q Is it fair to say, because I assume that you and Mr. Morrison would have talked about it, that if there was evidence of her receiving large amounts of money other than the one time probably somewhere around the last week of September 2024, that you would have mentioned it in your extensive slide deck?
A We actually did not discuss that. I don't recall off the

top of my head any very large deposits of like $20,000 or anything like that.

Q Thank you. And that very nice apartment was leased in Mr. Villamizar's name; correct?

A Yes.

Q And although her name appears on the lease for one of those cars, Mr. Villamizar is listed as the co-buyer; correct?

A Yes.

Q Okay. And you understand that you list a co-buyer when you need to demonstrate that you have financial support to purchase this vehicle; right?

A I mean, I think you could do it for if they are purchasing the car with you, whether you need their financial support or not.

Q Okay. Fair enough. So on direct examination, I believe you said that Ms. Duarte was assisting in installing the Raspberry Pi device; correct?

A Yes.

Q And by "assisting," what you meant is that on one occasion, she handed the device out the window; right?

A I believe it was more than one, but right now I can specifically remember, and as outlined in that presentation, one instance.

Q Correct. And then -- and that was at the Union Bank in Vermont; correct?

A Yes.
Q Okay. And then at that same time, she got out of the car and stood there; is that right?
A She was outside the car for that instance. I also spoke of a separate instance in Erie, Pennsylvania, where she was standing outside of the car as Mr. Villamizar was installing the device.
Q And so I want to ask you about that. So when you say "assisting and installing," what you really mean is perhaps being a lookout; right?
A Well, no, she's doing more than that. The lookouts are out there, but they're being lookouts from a distance. She's driving Mr. Villamizar and Mr. Tovar Camacho, Guillermo, who are installing it, and then she's physically handing the device to them. So she is assisting in those ways.
Q No, no. I'm trying to be surgical here. I understand that she drove, and I'm going to talk about that in a minute. I'm talking about your testimony that she was assisting in installing.
So what we have is the one occasion where she's handing the device out the window, and then on that same occasion, maybe another time, she gets out of the car and is standing there. Is that what you mean by "assisting and installing"?
A I mean -- what I mean by assisting with and installing, specifically, is driving the installers and handing them the

devices.

Q On one occasion?

A I believe it's more than one. Again, as I said, right now I can recall that one specific instance. So it's at least one time that she hands it to them.

Q Okay. So we have driving, standing, and handing on one or maybe more occasions; correct? That's her role?

A As it pertains to installing the device; yes.

Q And I don't think I heard you testify that you ever saw her remove cash from the ATM. Am I remembering that right?

A I didn't speak about that in my testimony.

Q You did?

A Did not.

Q Okay. And I don't think I heard you say anything about her laundering money or sending money overseas; is that right?

A I did not speak about that.

Q Okay. You mentioned that the group communicated on WhatsApp, which, based on your training and experience, people use to do all kinds of nefarious things; correct?

A Yes.

Q And WhatsApp is also a way for people to make international calls for free; right?

A It is.

Q So if you're talking to someone overseas, it would be a free way to do that without being charged for the call;

correct?
A One of the many free ways, but that is correct. But it is also a way to obfuscate the conversations from law enforcement because it's encrypted.
Q Well, law enforcement use WhatsApp all the time during stakeout operations, right, to communicate with other law enforcement agents, don't they?
A I don't use WhatsApp to communicate with law enforcement. We're not allowed to have it on our work phones.
Q Okay. So two of your slides, I believe, relate to these -- it's information about specific banks that are to be targeted; correct?
A I'm sorry. Could you say that again?
Q I think you have two slides that specifically reference -- there's lists of banks that are to be targeted; correct?
A No. There is one slide that has a list of all the banks that were targeted, if that's what you're referring to. It was two columns.
MS. BARRON: Your Honor, may I approach?
THE COURT: Yes.
MS. BARRON: Thank you.
BY MS. BARRON:
Q Agent Winn, I've just handed you my copy of the PowerPoint. The pages aren't numbered. I apologize for the

record. The page I handed you and the next page is the list I was referring to.
A Okay. Yes. So the first page that you handed me is where I was explaining that Ms. Duarte sent or received bank locations for banks that were targeted.
Q Right. And I think maybe I misworded my question. But I'm trying to just talk about that.
A Okay.
Q The list of banks that, I guess, were included in this WhatsApp chat of banks that were to be targeted; correct?
A I don't specifically remember if those were all in the WhatsApp chat. I believe that they were, but the bottom line is these -- Ms. Duarte sent or received bank location information for at least five banks that the crew did target.
Q And so that's my question. You titled it "sent, received, or possessed"?
A No. This one is titled "sent or received." The photos and videos include the word "possessed."
Q Right. If you will look at the next page.
A Right. So the next page talks about the videos and pictures. And that one, like I just said, includes the word "possessed."
Q "Possessed"?
A Yeah.
Q And so you don't really know if she sent any of these

pictures or locations or information about location, do you?

A No. I do know that. The reason I put "possessed" on this -- first off, the last page that talks about the bank locations, those were all sent or received. That word "possessed" wasn't there. So those were sent or received.

The ones with the videos and pictures -- the reason I put "possessed," added that, is because -- and it specifically spells it out in the slide deck.

So the first one, on August 4th, Duarte sent to Campo Paz. The next one, Duarte sent to Campo Paz. The next one, Duarte sent to Campo Paz, and that goes on.

The reason why -- for example, Union Bank on 9/7/24. Ms. Duarte's phone had videos of another Union Bank branch in Vermont taken on 9/7. I don't know if she sent those. So for that specific one, she possessed it.

Q Okay.

A I can say one, two, three, four, five, six, seven, eight, nine, ten -- at least ten of those banks, they were sent.

Q Okay. I want to ask you: I know that historical cell site data, there was a warrant to obtain it in this case, and I assume that you examined it; correct?

A Yes.

Q And so when you were, I assume, assisting the Government in figuring out what the loss amount should be, part of the

determination about what Ms. Duarte should be held responsible for or the incidents that she was involved in was based on historical cell site data; correct?

A That was one component of it.

Q Right. You've got surveillance videos. Cell site data is pretty hard to argue with; right? I mean, it shows -- if you live in New York and you're hitting towers in Vermont, it's pretty compelling; right?

A Yes.

Q Okay. So I'm going to come back to that in a minute. Actually, let's come to it now. Have you had a chance to look at the PSR in this case?

A No.

Q Okay. I'll represent to you that paragraph 12 --

MS. BARRON: Your Honor, may I approach?

THE COURT: Sure.

BY MS. BARRON:

Q So if you'll look at paragraph 12, it's a list of all of the incidents that were successful. And the very last sentence of paragraph 12 states that the incidents listed in bold are the ones where Ms. Duarte was involved. Do you see that?

THE COURT: Well, it says there "she was directly involved."

MS. BARRON: Correct.

BY MS. BARRON:

Q Directly involved.

A Yes. I see that.

Q Okay. So I want to talk about the photograph that you spoke with Mr. Morrison on direct and there are two individuals standing in a vestibule of a bank.

A Yes.

Q And there's a woman and a man. And in your opinion, it's likely Ms. Duarte because Ms. Campo Paz comes in at a different time; correct?

A There's multiple reasons. That's one of the reasons that I stated, was that Ms. Campo Paz had just exited the vestibule within two minutes or so of then that other woman coming in. So I don't think that Ms. Campo Paz would have been able to do a wardrobe change that fast.

Q Right.

A And, also, at the time the crew was operating with two women, Ms. Campo Paz and Ms. Duarte, and the physical description of that woman depicted in the video was consistent with Ms. Duarte.

Q Right. I understand that. And that picture is of a July 10th, 2024, incident at a bank, I believe, in Pennsylvania? It's the second item.

A It's in New York.

Q New York. You're correct. You're right.

A It was July 9th or 10th, somewhere around that time frame of 2024.
Q Okay. And if we look at paragraph 12 of the PSR, that is not identified as one of the incidents where Ms. Duarte was involved. Would you agree with me?
A It's hard to see which ones are bolded. It looks like that is not bolded.
Q Okay. And because you analyzed the historical cell site data for my client, you're able to pinpoint where she was in location to the robberies for all of these incidents; correct? I say "robberies." Bank larcenies.
A The historical cell site data will tell us where her phone is. You can't say for sure that the person is with the phone, but it will tell you where the phone was.
Q Okay. I want to talk about the decision to retain counsel or the helping to find counsel.
You're aware, I assume, that about 20 years ago, the Justice Department got in some trouble for examining like when a company looks for, that is considered a target of an investigation -- looks for and retains counsel for people who work for that company. The Justice Department got in some trouble for considering that fact when evaluating whether the company was culpable and whether that was a relevant factor for culpability. Are you familiar with that?
A No.

Q Have you ever heard of the Larry Thompson memorandum?
A No.
MS. BARRON: No more questions.
THE COURT: Mr. Morrison.

REDIRECT EXAMINATION

BY MR. MORRISON:
Q Agent Winn, Ms. Barron was asking you about the bolded events in the presentence report. Do you have that in front of you still?
A No, sir. She took it back.
Q That's okay. On page 9 -- I'm looking at it, and if I tell you on page 9 of the presentence report, it lists the three incidents in Dover, Delaware; Smyrna, Delaware; and Milford, Delaware; the Del-One Federal Credit Unions, those would be the three incidents in which the ledger was found on Ms. Duarte's phone; correct?
A Yes.
Q And if I was to tell you that they are not bolded, would that change your opinion whether or not she was involved in those incidences?
A No, it would not.
Q Thank you.
THE COURT: Anything else?
MS. BARRON: No, Your Honor.
THE COURT: Thank you, sir.

THE WITNESS: Thank you, Your Honor.

(Witness excused at 12:27 p.m.)

THE COURT: Call your next witness.

MR. MORRISON: No further witnesses, Judge.

THE COURT: All right. Let's talk about these objections. So let me start it this way.

We've got a Base Offense Level of 7 for bank fraud. We add on 14 for the loss being greater than 550 but less than 1.5 million.

The Government says -- now, that's the legal objection there. But we might as well talk about that, as far as it goes for restitution, while it's fresh on our minds here.

So Mr. Morrison, her position, "her" being Ms. Duarte's position, is that 862,000-ish, that figure is the right number for restitution. Tell me -- the Government says it's 1.435.

MR. MORRISON: And, Judge, it's the Government's position that she was involved in this conspiracy, Your Honor, and the actions of all the Co-conspirators were reasonably foreseeable to her. We know that she was the live-in girlfriend, the live-in paramour of one of the leaders of the conspiracy. She was involved in multiple incidents of the conspiracy, and now we're supposed to believe that it wasn't reasonably foreseeable, even though she was not physically

present at some, that this crew that was here for no other purpose than to commit jackpotting would commit other jackpotting events. That's why we say she should be held responsible for the 1.4 million.

THE COURT: Okay. I always give you the last word, Ms. Barron, because you had the first word. So go ahead.

MS. BARRON: I appreciate that, Your Honor. I think that when it comes to reasonable foreseeability, it's more than just knowing that people are doing things within the conspiracy. There has to be some evidence that she knows that these specific acts are going on or has reason to suspect it. And, you know, other than just an inference, in my view, Your Honor, there's not enough.

THE COURT: Let's talk about that just for a second. This is a bank fraud conspiracy. Let's assume this is a drug conspiracy and I'm one of the -- I'm not the wholesaler. I'm one of the mid-level guys who I've got my own stable of folks I'm selling to on the street or distributing it to the community. I don't have to know every single drug deal those people are making, and I don't have to know every single drug deal the guy ahead of me is making. I've just got to -- I mean, I'm part of the conspiracy. I don't have to know every single thing. Why is it different for bank fraud?

MS. BARRON: I will concede that this is not my strongest argument. I will just say, Your Honor --

THE COURT: Fair enough.

MS. BARRON: -- that I --

THE COURT: Fair enough. That's fair. I understand.

Let me say this: I think that when you are involved in a conspiracy, you get tagged with the whole conspiracy. That's what you get. And I think that's the law and that's the way it is.

I do believe, based upon my looking at the evidence and my review of the presentence review report, that it was reasonably foreseeable that this was going on. I would even -- it's not in this case. I would have gone so far as to say it's probably more likely you would get tagged with the other four crews in the country. But that's not in this case. This is one crew. The other three crews are at large or potentially at large. It doesn't matter. I'm going to overrule that objection.

I'm going to find, number one, that a 14-level enhancement applies because it's greater than 550 and more [*sic*] than 1.5. To the extent that you have an objection to that, I will let you -- I'll just overrule that for the record and let you preserve that. And then I'm going to go ahead and find that the restitution amount is 1.435. So we can set that aside.

Let's go on now to -- Ms. Barron, you had an

objection as to ten or more victims.

MS. BARRON: Yes, Your Honor.

THE COURT: And you said your count was nine.

MS. BARRON: Well, Your Honor, this being the hill I am not going to die on, given the Court's ruling on loss, I think it's the same logic.

THE COURT: I agree. I was going to say at some point, this is going to compound upon itself. If I'm wrong about the reasonable foreseeability of that, I'm probably going to be wrong about every single thing.

I count more than -- let's put it this way: I count at least ten alleged victims on that. I find there are at least ten, and I'm going to add a plus 2 for that.

Now let's go to substantial part of the fraud committed from outside that involved -- and I think Mr. Morrison can speak to this in a second. The way the PSR reads, it say, "Substantial part of fraud committed from the outside and involves sophisticated means."

MR. MORRISON: It's an "or," Judge. But I believe we proved an "and," Judge. A, we know that in one instance, she definitely assisted with the installation of the device. We know from her interview with Agent --

THE COURT: Hold on a second. Forget that. I know what you're going to say.

MR. MORRISON: That's why I'm getting to The

Engineer, Judge. We know that. But even cutting that out, Judge, we know that she knew when she was on these WhatsApp calls that there was a hacker in Venezuela, out of the United States, who was assisting with these events.

THE COURT: Hold on. Is it an "and," or is it an "or"?

PROBATION: In the presentence report, at paragraph 27, I do have "or."

THE COURT: Okay. What does the sentencing guidelines say? Is it an "and," or is it an "or"?

PROBATION: "Or." Either one of them applies to get the plus 2.

THE COURT: All right. It's not a plus 4. It's a plus 2 by either way?

PROBATION: By either way; correct.

THE COURT: Either a substantial part of the activity from outside the US or a sophisticated means?

PROBATION: Yes, sir.

THE COURT: Okay.

MR. MORRISON: And, Judge, my argument is we can prove both. But I'm saying the easiest is clearly The Engineer outside the United States.

THE COURT: I got that. I want to talk about sophisticated means a little bit because this is interesting to me because Ms. Barron is about to tell me -- in a second,

she's going to break things down to very granular tiny little details.

Whereas, you know, in my head, if I hand you the gun and you kill somebody, I got murder, I'm an accessory, I substantially assisted, aided and abetted to steal from state law, you in that murder, as I would understand Ms. Barron's argument, she would say no, that's not -- "I just handed it to you." It's just a simple act of moving my arm. That's not sophisticated on that.

You're not taking the position, I hope, that WhatsApp automatically converts everything into a sophisticated means?

MR. MORRISON: I didn't even mention WhatsApp.

THE COURT: No. Your agent did.

MR. MORRISON: No. No. It's a factor, but no, Judge. I think you can get there even without the WhatsApp calls.

THE COURT: Well, that's the other thing too. Everything in this world now is sophisticated. A lot of the things are very sophisticated, but it doesn't mean you get a two-point enhancement every single time.

MR. MORRISON: Correct. Every time you use a cell phone.

THE COURT: That's exactly right.

Ms. Barron, he says it's an "or," so now you've got

to shoot at two things.

MS. BARRON: No. I always knew that, Your Honor. The guideline is very clear. You can get that two points -- there's actually three options. I think the first one is like mass-marketing or something. So either one of these and she gets the two points. That's a hundred percent right.

So I'd like to talk about sophisticated means. So the Court's understanding of that enhancement is correct, up until 2015. In 2015 the Sentencing Commission changed the guideline. This is what the *Buchanan* case outlines: that now the Government has to show not just that this scheme is sophisticated and that she participated in a sophisticated scheme but that her specific involvement was sophisticated. And so what we have here is driving, standing, and handing.

THE COURT: Okay. Let's expand this argument a little bit. To any of the 11 members of this scheme, you would then have to -- in order to be consistent, you would have to argue that none of them could get a sophisticated means enhancement?

MS. BARRON: No, Your Honor. I think that whoever this hacker guy is, clearly. I think even the installation.

THE COURT: You would say he just moved a couple keystrokes.

MS. BARRON: Well, no, Your Honor. There is a difference, and I feel comfortable saying most people would

find a difference.

THE COURT: Forget about the hacker. The people in the US. Just because they took a very sophisticated box -- you can tell how ignorant I am. I'm going to call it a "box" -- and put it and stuck it with a magnet on a machine, your argument would be that's not sophisticated, they added nothing to the sophistication, the sophistication were the people who created the box and the people who controlled the box?

MS. BARRON: If what makes that -- I will give you my view of these facts. To me, what makes this scheme sophisticated -- I mean, if you're just going in and breaking into an ATM and taking money, that's not sophisticated. What makes this sophisticated is that you've got this device that is interfering with traffic between the ATM and the bank, mixing signals. That's incredibly sophisticated.

THE COURT: No question.

MS. BARRON: So that process is what makes it sophisticated, but that doesn't mean that everyone who somehow has a role leading up to that process has engaged in sophisticated conduct. If all a person does is even attach it to the machine, which is more than she did, I would have a hard time saying that even that is sophisticated.

THE COURT: So the answer to my question is: Yes, other than the hacker, nobody gets a sophisticated means enhancement?

MS. BARRON: Given their individual roles -- again, unless the person who is actually installing it -- and I don't have a full understanding, even today, of how that works, whether they are like moving around wires or they are just like plugging something in. If it's more sophisticated than that, then maybe. But if all they're doing is attaching a device, there's nothing sophisticated about that. There's nothing inherently clever about that that is essential to the scheme.

What makes this scheme sophisticated is something that is done by someone else.

THE COURT: All right. Well --

MS. BARRON: So it is true that in a lot of complex conspiracies, most of the people aren't going to get this. It's going to be the guy at the top who's designing everything.

And that's why that guideline change was made in 2015 to demarcate between people who are responsible for making it so difficult to detect.

THE COURT: Okay. Talk about outside the US.

MS. BARRON: So this comes down to that hacker. If the Court finds that she sufficiently knew that there was hacking coming in from outside and that that hack -- and so the operative question is "substantial." Is a substantial amount of the conduct coming in from outside? And if -- you

know, the testimony appears to have been that this scheme could not have worked without the hacker coming in and rewiring these codes, based on Mr. Villamizar's interview -- and this is why I put this in my sentencing memorandum, based on his 302. He communicated that they were specifically targeting these low-level banks because they were just easier to break into, so that you wouldn't have to hack.

But I understand that the agent's testimony here was more expansive than that, and I don't have any evidence to counteract that.

And so if the Court concludes that a substantial amount of the conduct was done by that hacker, then it does appear that a substantial amount of the activity did occur outside the United States.

THE COURT: I don't want to fight on the individual's sophisticated means. That's too murky, and there's no need for me to wade into that.

I think what I can find, based upon the agent's testimony and the review of the PSR, is that there is no question that this originated outside the US from Venezuela and came in.

And certainly, in my mind, the very fact of the testimony that there were two separate WhatsApp calls. So there's no way the two could mix. We've got Cochi in the middle -- or Cochi (pronouncing), whatever his name is --

MR. MORRISON: Cochi.

THE COURT: -- is in the middle so that people don't know. I mean, The Engineer is very smart at protecting himself.

So I do find a substantial portion of this -- and you're right: The real brains of this outfit is The Engineer, the guy in Venezuela who is doing all of this. But I'm going to add plus 2 for that.

Now let's get to the last one, which is the possession or/use of device-making equipment.

This is where -- anyway -- it's put in, and what it -- as I understand this offense characteristic, it's based upon 18 U.S.C., Section 1029, and that is the Code Section that criminalizes fraud in connection with access devices. And we're going to get into the definition under subparagraph (e), and that's where Congress has defined certain terms --

So, Mr. Morrison, Ms. Barron has told me that she thinks that the term "access device" in subparagraph (e)(1) relates to the term "communication service" in subparagraph 9, which refers you back to the Communications Act of 1934.

So tell me the Government's response as to --

MR. MORRISON: I don't read it that way, Your Honor. In the PSR, it references "2B1.1(b)(11)(A)(i)" -- I believe it should have been uppercase "B", Your Honor -- which is that if the offense involved the --

THE COURT: You're talking about U.S.S.G. guidelines?

MR. MORRISON: Correct. I know what you're getting to, Judge.

THE COURT: No. I want the record to be clear. I was reading from 18 U.S.C., 1029. You're referring to the sentencing guidelines.

MR. MORRISON: I am. Correct, Judge.

In the sentencing guidelines, "If the offense involved under (B) the production or trafficking of any (i) unauthorized access device or counterfeit access device." That's what we have here, Your Honor. We have the testimony from Agent Winn. I think it's clear as day. It establishes that.

THE COURT: Right.

MR. MORRISON: I don't agree with the telecommunication; however, that's why I listed the testimony about the Wi-Fi puck, Your Honor. We also have the testimony that that device had to operate based upon a telecommunication hotspot, the telephone, which a Wi-Fi puck is nothing more than a cellular telephone, Your Honor, that you don't place calls from.

THE COURT: Right. Let me ask you this, and I'm going to ask Ms. Barron this in a second. Let's look at 18 U.S.C., 1029, subparagraph (e)(1). It says: "As used in

this section," number one, the term 'access device' means any card, plate, code, account number, electronic serial number, mobile identification number, personal identification number, or other telecommunications service, equipment, or instrument identifier, or other means of account access that can be used, alone or in conjunction with another access device, to obtain money, goods, services, or any other thing of value, or that can be used to initiate a transfer of funds, other than a transfer originated soley by paper instrument."

That last piece of "or" -- "or other means of account access that can be used," doesn't that suffice for the plus 2 here without referring back to the Telecommunications Act?

MR. MORRISON: And, Judge, if I may give Ms. Barron the last word, if I just state this: Yes. And that is why this Code Section encompasses skimming devices that capture account data.

THE COURT: Well, I was going to get to that. We're talking about account numbers or personal identification numbers, both of which could have come off the skim.

MR. MORRISON: Correct.

THE COURT: Ms. Barron, back to you.

MS. BARRON: Your Honor, we have a bigger problem here now.

THE COURT: Okay.

MS. BARRON: And that problem is one of notice.

THE COURT: Okay.

MS. BARRON: So on September 15, 2024, I was given a revised copy of the PSR that specifically noted (b)(11)(A)(i), device-making equipment. The Government did not object, has never objected, has never said, "Oh, we don't mean that. We mean 'access device' as it's defined somewhere else."

So what I'm on notice to be prepared to argue today is whether the Raspberry Pi is a device-making equipment, as that is defined by statute, as it is defined in the commentary. And so if the Court concludes that this applies by some other means, then my objection is going to be one of due process and notice.

THE COURT: Sure. Tell me: Where does it say -- tell me the device-making equipment.

MS. BARRON: So Application Note 10(A).

THE COURT: Let me go to another book. 2B1.1, is that it?

MS. BARRON: Yes, Your Honor.

THE COURT: 2B1.1(11)(A)?

MS. BARRON: Yes, sir. The guideline is B(11). It says -- B(11)(A)(i) is what's -- what I'm on notice to be prepared for.

THE COURT: Hold on a minute. I've got to get there. Application notes of -- okay. Application of

subsection B(11); correct? Device-making equipment; right?

MS. BARRON: Yes, Your Honor.

THE COURT: Has the meaning given that term in 18 U.S.C., 1029(e)(6).

MS. BARRON: Yes, Your Honor.

THE COURT: Give me a minute. 1029(e)(6). Go ahead.

MS. BARRON: So as the Court has seen, device-making equipment is "equipment, mechanism, or impression designed or primarily used for making an access device or counterfeit access device." So it is something different than an access device.

So the testimony from Agent Winn was that the device itself is a skimmer or can function as a skimmer/scanner. Device-making equipment is something different, and that's what this enhancement -- what I've been put on notice this enhancement is for. And so that's my argument, is that it's just not that, nor has there been any testimony on how it is used to make access devices.

And so that's the analysis on page 11 of my sentencing memorandum. I understand the Government has a different argument now, but they've had over two weeks to point this problem out, and they haven't.

THE COURT: Let me ask you this: Under subsection (b)(11), under device-making equipment, the last portion --

Roman numeral II, it says "a scanning receiver referred to in 18 U.S.C., Section 1029(a)(8)." That term says, "The term 'scanning receiver' means a device or apparatus that can be used to intercept a wire or electronic communication." Isn't that what Agent Winn testified to as he said that the quote unquote skeleton key intercepted the transmission from the bank's servers to the ATM machine? You know this problem is real. I'm not arguing about that. I'm going with what you were on notice about. Doesn't that still suffice?

MS. BARRON: Well, Your Honor, I will tell you I am completely unprepared to answer that question. I will tell you -- I'm a former AUSA up in Atlanta. I was a fraud AUSA the whole time I was there. I've been doing defense for a long time. I'm very familiar with 1029. So based on the testimony, I see how the Court is saying, "Well, it could be this." I understand that.

THE COURT: Okay.

MS. BARRON: But I am flying blind here because I haven't -- even things that I think -- I think I know "sophisticated means" pretty well, but I always do my research to make sure I'm prepared.

THE COURT: You're an exceptional lawyer. You're an exception lawyer, and you make me work hard, and that's the best compliment I could ever give a lawyer, is that you make me work hard.

I think it is. I think based upon the agent's testimony of -- let me say this: I don't think the Government tried to bait and switch on you. I really don't. I just think it happened. It is what it is. You should have gotten notice. You didn't. Fine. But even what you are on notice about, I do think the agent's testimony that it intercepted the wires, the communication between the bank server and the ATM machine, I think will qualify under 18 U.S.C., 1029(e)(8). I'm going to apply it and let you preserve the objection.

MS. BARRON: Thank you, Your Honor.

THE COURT: With that being said, we end up with a Total Offense Level of -- well, we're going to talk about this in just a second.

Mr. Morrison, you had some late filings, and you don't like the acceptance of responsibility.

MR. MORRISON: That's correct, Judge.

THE COURT: Tell me about that.

MR. MORRISON: Judge, let me preface this by what I put in the footnote. What I'm about to say has nothing to do with Ms. Barron. I believe she made good faith arguments. I believe she was acting upon information she received from her client.

In the PSR objections and in the sentencing memorandum, specifically as to the PSR objection, she stated, "She did not stand to benefit from the conduct because she was

never paid." We now know that is patently false, Your Honor.

She stated, "She is substantially less culpable than other participants." We know that is patently false.

She stated that "The only acts she committed in furtherance of the conspiracy was handing the device to a crew member on one occasion and likely at her boyfriend's direction, Mr. Villamizar."

And she also stated, "She lacked knowledge that someone in Venezuela was actively intervening and causing the bank ATM thefts." We know that is patently false based upon her interview that she gave to Agent Winn.

And then in her sentencing memorandum, she doubled down on the fact that she was never paid for involvement in this conspiracy.

And she stated, "She's a minimal participant in this conspiracy and barely even a member at all. It's hard to imagine what a role a Defendant could possibly have played to be less culpable and still be criminally responsible."

THE COURT: What do you say to her questioning of Agent Winn? Yes, you've got the note on her phone that says this is her cut, but is there a difference between being told you're going to get a cut and then getting the cut, where there is no financial records of a large sum coming in?

MR. MORRISON: Because this was a case-based business, Your Honor. She's not going and depositing it into

the bank. We know that she was -- look at her lifestyle, for one. She's been in the country for over ten years, has never had a job. She's living in a $6,000-a-month house, luxury vehicles -- two houses, Your Honor. It's clear that she was getting a cut.

And, Your Honor, the case law is clear that if you come in and you minimize your role or you just plain lie, which is what happened here, you do not accept responsibility and the three-level -- or if the Court would give her two and the Government would be one -- should not apply.

THE COURT: Well, let me say this: I agree with you that I don't lay anything nefarious or improper at the feet of Ms. Barron. I'm with you on that. I second your assertions on that. Ms. Barron.

MS. BARRON: Thank you, Your Honor. I appreciate that.

So the question with the role adjustment comes down to: You have to look at everyone in the scheme, look at their relative roles, and see where she falls.

And Agent Winn agreed on cross-examination that he has no evidence that my client acted as the person who was attaching the machine, that was -- that was called the "setter," in the parlance of the conspiracy, or the "remover," the one who was taking money out. We know she wasn't the hacker. And he also conceded that she didn't launder any

money.

So then the question is -- those are the average roles in this conspiracy. So then we say, "What did she do?" She drove Mr. Villamizar down. I admitted that in my sentencing memorandum on page 2. She drives him down there, knowing he's going to be doing this. She is driving him. She is definitely present. There's no question about that.

I think we heard testimony on at least one occasion, maybe twice, she actually gets out of the car. Still not clear what she's doing or what that role is, but we know she's outside the vehicle on those two.

And then the third thing is that on one occasion -- maybe another occasion, but we're not certain -- she hands the device through a window. And so when we compare those actions with the average participants -- setters, removers, hackers, and launderers -- she's not even close, Your Honor. So I think at least two levels to recognize that her role in all of this is much lower than everyone else.

As to the money, again, no question. She lives with Mr. Villamizar, so she's going to benefit from his lifestyle and from the money. But in terms of her being directly paid, the agent -- I mean, he has her bank records; he looked at them.

THE COURT: But the whole purpose -- I mean, Mr. Morrison makes a very fair point. The whole purpose of

this is to skim cash, I mean real cash.

MS. BARRON: Right.

THE COURT: We're not talking about flying-through-the air cash. We're talking about hard dollar bills.

MS. BARRON: I understand that, Your Honor. And the truth is that when you have a conspiracy like this where there's a lot of money coming in, if one Defendant gets a lot of money, everyone who lives within -- their children, their spouses, everyone -- is benefiting. So benefiting alone is not enough.

THE COURT: You're right. And this is not her, but in a typical drug conspiracy, I think the posse is just as liable as the main guy because they are supporting them, they are encouraging them. All that plays into that.

Mr. Morrison, what do you say about this? This is not the case where she's -- we've given her -- on restitution, I've given her -- I've made her take responsibility for the entire conspiracy. This is not the situation where you've only been made liable for your own personal conduct, in other words, the 862 on that.

So this is not where -- in those cases, the Government, in response to a mitigating or minor or whatever role -- the Government always says, "Judge, there is nothing to compare it to because she only had irrelevant conduct.

That's all she took responsibility for. That's all she should get. You can't do anything else; you're boxed in." And the Government is right about that: I'm boxed in.

But now I made her take responsibility for the whole conspiracy. So now I do have to truthfully compare. We know she's lower than The Engineer. She's got to be lower than the hacker.

MR. MORRISON: Judge, she's absolutely lower than the hacker. And I'll submit she's lower than her boyfriend, Villamizar. However, she's above Oliver because we know from the interview of Oliver's mother --

THE COURT: I don't doubt that. She ain't the bottom. I'll give you that.

MR. MORRISON: She's not the bottom, Judge. And we know that on over more than ten occasions, she was responsible for sending out the bank locations, instructing these individuals where to go.

THE COURT: I got you. But don't you agree I've got to compare the whole conspiracy now?

MR. MORRISON: You've got to compare the whole conspiracy.

THE COURT: I've got to look at her role --

MR. MORRISON: Yes.

THE COURT: -- in the whole conspiracy, not just her tiny piece now because --

MR. MORRISON: I think in the US.

THE COURT: -- I made her take relevant conduct of the entire conspiracy.

MR. MORRISON: Okay.

THE COURT: So she can't -- the Government can't get it both ways now.

MR. MORRISON: I understand.

THE COURT: So I'm asking you: In that, doesn't she get some sort of a mitigating role?

MR. MORRISON: I disagree, Judge, that she gets a mitigating role --

THE COURT: Okay.

MR. MORRISON: -- when she's involved in the planning, in the execution of these things.

Let me give you an example. If José was sitting here, yes, he should get a mitigating role, Your Honor. He's just told to drive up and take out cash out of the machine. That's a mitigating role.

Here, we have somebody -- you don't have to be the top, which we can see she's not. But she's not the bottom, Your Honor.

THE COURT: I understand that.

MR. MORRISON: I know where you're going.

THE COURT: But there is a 3, 2, and a 1 or a 4, 3, and a 2 --

MR. MORRISON: Correct.

THE COURT: -- that goes into that.

MR. MORRISON: There is.

THE COURT: I'm not at all suggesting that she is a minimal participant. I'm not suggesting that. I guess the question is: Is there -- is it a 3, or is it a 2, or is it anything? And what I'm worried about is people looking over this later on --

MR. MORRISON: I understand.

THE COURT: -- and they'll say, "Well, wait a second. You made her take responsibility for the whole conspiracy. You've got to look at the entire conspiracy on that." And I think that's what the law says. I think that's the law. That's my concern.

MR. MORRISON: I understand.

THE COURT: What else did you want to say? Anything else you want to say?

MS. BARRON: No, Your Honor. I just wanted to point out that for mitigating role, the 3 is not an option. The 3 is only an option for aggravating. So it's either the 2 or the 4.

THE COURT: I got you. It ain't going to be a 4, if it's anything. I can tell you that. So it's either a 2 or it's a nothing.

MS. BARRON: It's either a 4, a 2, or a nothing.

THE COURT: All right. Let's talk about acceptance of responsibility.

MS. BARRON: Yes, Your Honor.

THE COURT: Talk about that.

MS. BARRON: So as I understand the Government's argument, it's really based on two things. It's based on the fact that Ms. Duarte is claiming that the person in that video is Karen Campo Paz, based on her review of it. And I understand the agent says it couldn't have been her because of the wardrobe change.

But this is my question. I mean, the agent said that, you know, he's helping advise the Government -- maybe Mr. Morrison knows how to do historical cell site data, but in my experience, the agents are the ones who do that.

And so Agent Winn would have identified: What are the instances where she is present? Where does the historical cell site data line up with all the other data we have? And she is not identified, in paragraph 12, for that July 10th and July 9th and 10th, those two robberies that are in July. She's not identified as being involved.

And so then on redirect, Mr. Morrison comes back and he says, "Oh, but the Delaware thing. We know she's involved, and it's not bolded."

But here's the thing: The Government had an opportunity to object. And based on the agent's testimony, it

appears that there's no historical cell site data linking her to that. There is no video surveillance or camera footage linking her to the July 10 incident, and there's no ledger or any other document or WhatsApp chat. There has been no testimony that she is there.

And so our statement that it's not her has not been proven to be false, Your Honor. I don't think there's enough proof to show that she lied.

THE COURT: Talk about the money.

MS. BARRON: The money. So it does appear, based on the ledger, that she is at least -- in that one, it looks to be the Notes application of Apple. I'm assuming that just based on the way it looks. There's that one document that says that she received roughly around $25,000.

The agent testified that he did not see any evidence or doesn't remember seeing any evidence of money coming into her account. We know that she's not really paying -- I mean, they have this lavish lifestyle. She's not paying it. Mr. Villamizar is. And he's, you know -- to use the modern parlance, appears to be, you know, a sugar daddy. He is very lavish. Lots of cars. Lots of money. Fancy perfume. I saw the Louis Vuitton bag. He treats her very well.

And so like everyone who lives with someone who is getting illicit proceeds, she definitely benefited. There's no question about that. But she was not directly paid, at

least not that I've seen. There's that one document, and I can see that it says what it says. And I don't have anything to say about that, Your Honor.

THE COURT: Okay. This is what we're going to do: I'm going to just let everybody preserve all of their objections. Just anything you've already argued is preserved.

This is what we're going to do: Base Offense Level of 7, plus 14 for having a loss of more than 550 but less than 1.5 million, plus 2 for an offense characteristic of ten or more victims, plus 2 for substantial part of fraud committed from outside of the US, plus 2 for possession or use of device-making equipment, minus 2 for the role, minus 2 for zero-point offender. That gives me a 23 and a I. Did I do that right, Jessica?

PROBATION: Yes.

THE COURT: Okay. That gives me a 46 to 57. That's what the Court's findings are: 46 to 57 on that.

So let me say this: I don't think you did anything wrong, Ms. Barron. I've said that before, and I'm going to say it again. Mr. Morrison has said it too.

I do think, though, that your client put you in a terrible position because she knew what was on that phone. She knew that she had gotten paid some money. She let you make her assertion that she did not. That's why I took away the minus 3. That's for the record so everybody understands

that.

I don't see how to get around the minus 2 because if I don't give her a minus 2, I'm effectively holding her equal to the hacker. That's my concern. That's where I'm at.

Mr. Morrison, what do you say for a sentence?

MR. MORRISON: Judge, I think we also have to look at the 3553 factors.

THE COURT: We do. You are correct.

MR. MORRISON: Since the Court has found that she's responsible for the $1.43 million in loss, that is at the top, the very top, of the range, Your Honor. I think the Court would be well reasoned to upward variance, to give her an additional two levels.

THE COURT: Okay.

MR. MORRISON: Thank you.

THE COURT: All right. Ms. Barron, what do you say?

MS. BARRON: As to that or as to the entire 3553(a), Your Honor?

THE COURT: You can say anything you want to say regarding what you think an appropriate sentence is under these facts.

MS. BARRON: Thank you, Your Honor. I have one exhibit to offer.

THE COURT: All right.

MS. BARRON: If I may approach?

THE COURT: You may.

MS. BARRON: Thank you. So I'll describe what it is, and then I'll move it into evidence, and then I'll talk about why I think it's relevant.

So what this is -- is it's a three-page document that is screenshots that I pulled off the US Sentencing Guidelines website, US Sentencing Commission website.

They have this awesome little tool on there called the Interactive Data Analyzer. And you can use that tool to look at what are the average citizens nationwide, by circuit and by district, and you can feed it a lot of information.

So I will tell you that what this is -- and it's in tiny print below, but it does say -- this is -- page 1 is nationwide; page 2 is Eleventh Circuit; page 3 is Middle District of Georgia. These are average sentencing lengths for defendants who have been convicted of a fraud offense, who are sentenced under 2B1.1, who fall in Zone D, and who have a Criminal History Category of I, and this is for the year 2024.

THE COURT: Any fraud?

MS. BARRON: Any fraud.

THE COURT: Okay.

MS. BARRON: Well, any 2B1.1 fraud.

THE COURT: That's fair.

MS. BARRON: So it's not going to include tax fraud because that's in a difference section.

THE COURT: That's very fair.

MS. BARRON: Money laundering, right. So it's a 2B1.1 fraud. And so --

THE COURT: Just your normal person who's stealing Government checks and that kind of stuff?

MS. BARRON: Correct. Bank fraud, wire fraud, this is going to be the data.

And so the average -- 2004 [*sic*] average length of sentence is 30 months. And so this is also going to include people who went to trial. It's going to include people who get role enhancements. It's going to include loss amounts much higher than 1.5 million. And I know that's a lot of money.

THE COURT: How many cases involve more than 1.5?

MS. BARRON: Well, I'll tell you the last case I prosecuted, the last trial I had as a prosecutor, was a $26 million embezzlement that we prosecuted a lawyer, real estate lawyer, who embezzled $26 million from his firm's trust account.

THE COURT: He lives in the St. Regis.

MS. BARRON: He did. In the universe of fraud cases, it is a lot of money, especially for these small banks. I acknowledge that it's a whole lot of money. But in the universe of looking at this guideline, it's relatively small.

And so nationwide, average 30. Eleventh Circuit is

a little higher; average is 38 months. In this district, a good bit higher; the average sentence is 48. So that's average. And the Government wants the Court to send her to jail for more than five years.

And so what is it that justifies? I understand that the Court withheld acceptance of responsibility. But it can still consider the fact that she resolved this case early. I filed a motion to dismiss challenging the way this case was charged, whether as pled it's even bank fraud. And I still think that's a pretty good argument.

She decided it's not worth it. Let's withdraw that, let's plead guilty, and let's get this over with and get my sentence started. So the Court can consider that.

It can consider Defendant's Exhibit 1 when considering avoiding unwarranted sentencing disparities. What is it about her that puts her so many standard deviations above the average? It's not clear to me, and I've been doing this a while.

And I know the Government is going to say that her son Esteban was involved and he's a conspirator. But the reality is -- and I mention this in my sentencing memorandum -- the worst punishment anyone could ever get is to grieve your child alone. And her son Esteban died while she was in custody. She wasn't allowed to go to the funeral. She's been grieving that alone, and it's been horrible, Your

Honor.

And so I ask the Court to consider the fact that she is going to spend -- it seems like removal proceedings are moving a little faster these days. But there is going to be some time, based on what I'm hearing, 30 to 45 days -- some time in custody after she's released here.

She's not going to be able to receive designation in a minimum or camp facility, which if she weren't an immigrant would be the obvious choice for her designation. So there are things she's going to experience because of her immigration status, and the Court can consider that.

But the main thing, Your Honor, to me, is that she just has absolutely nothing in her past that shows that this is anything other than aberrant behavior and nothing to suggest that she's at a risk of recidivating.

She's going to go back to Colombia, where her nursing license remains active. They don't have the processes like we do here where if you're convicted of a felony, there's going to be a board that could potentially remove your license. And she understands that she can't come back here for 20 years.

So the risk of recidivating and violating another US law is very low. And so that's why I ask the Court -- I understand that my request of a time-served sentence now seems disproportionate given the new guidelines range, but an upward

variance, I can't even imagine what compels the Government to ask for something like that. And I have so many questions about -- I'm going to stop there.

Your Honor, there is no universe in which my client should spend four to five years in jail. And so I ask the Court to consider a sentence of no longer than 24 months.

Thank you.

THE COURT: Okay. Ms. Duarte, do you want to say anything? You have the right to do so.

THE DEFENDANT: Yes, sir.

THE COURT: Okay. Go ahead. I'm glad to hear you.

THE DEFENDANT: After listening to everything that everybody says about me today, I was asking to myself, "Looking at you, what can I tell you?" And the only thing that I would like to do is to introduce myself as a person, as a person that I am. I'm Colombian. My whole family lives in Colombia. My parents live, thank God. I lost one of my children when I was in prison.

But the most important thing, what happened to me after I was arrested. Being in prison teach me how to know myself, how to get to know myself. It was a big opportunity to look at myself.

In reality, I'm not the person that is showing in here. I'm being Christian all the time, but I was away from God for a while, for incidents that came to my life, and I

made that decision to stay away from God. And when they arrested me, it was an opportunity to get back to God and to show to myself who I am really.

Ever since I was arrested, I went to five different prisons and I have the opportunity to preach about God to many people in jail. Butts County, that I have spent seven and a half months in there, I have the opportunity to convince seven women to join me into the God belief.

I regret many things different and just that I pled guilty in another court.

My family. My brother is a preacher in a church. There were so many people praying for me today in order to be justice for me today, but with the truth. I ask God for forgiveness already. Same I'm doing right now with the law before the Court. It's not me, what they are describing in so many ways.

I would like to thank the district attorney and my attorney and yourself. And I also would like to go back to Colombia. My mother is waiting for me, and I really would like that opportunity. I would like to take my son's ashes back to Colombia.

MS. BARRON: Your Honor, I got ahead of myself. There are actually -- her children are here. Her son was going to speak. He was driving down from North Carolina and apparently had a blowout, so he's not here. But his wife

would like to speak.

THE COURT: Sure.

MS. BARRON: And then the girlfriend of her son Esteban, who was killed, would like to speak briefly, if that's okay.

THE COURT: Sure. If they're kind enough to come, I'm kind enough to listen.

MS. BARRON: Thank you, Your Honor.

THE COURT: Good morning. Tell me your name.

MS. DULCE MENDOZA: My name is Dulce Mendoza.

THE COURT: Spell it for me.

MS. DULCE MENDOZA: D-u-l-c-e.

THE COURT: Mendoza?

MS. DULCE MENDOZA: Yes.

THE COURT: Okay. I'm glad to hear from you, ma'am. Go ahead.

MS. DULCE MENDOZA: First of all, I'm here because I need to give my mother-in-law support about what I read, the situation. And I would like to thank her because she raised an amazing husband for me. She's a good father. She's a good mother. And we all now have three kids. And a baby girl that she haven't meet yet because of this situation. But, you know, that we had God in here. We are all human. We all make mistakes. And no matter what, like, we always need a second opportunity of this life. And thank you for that.

THE COURT: Thank you so much, Ms. Mendoza. I appreciate you coming here.

MS. ANA OVIETO: Good morning, Your Honor.

THE COURT: Good morning. Tell me your name.

MS. ANA OVIETO: My name is Ana Ovieto.

THE COURT: You're going to have to spell that for me, I promise you.

MS. ANA OVIETO: Yes. A-n-a, O-v-i-e-t-o.

THE COURT: Thank you.

MS. ANA OVIETO: I wrote something because I wanted to, like, be prepared and say the right things. So I'm just going to go through it.

I've known Karol for six years now. And what I can tell you about her is as a person, she is a great mother. She has a wonderful heart. She is a wonderful grandmother and to me, a friend. She is tough, sweet, generous.

I admire her for so many reasons, but one of them is for being able to raise three children by herself. Karol is a strong foundation in her family. She always was willing to give, to support, and to be there for us. We miss her so much. And these past months are just miserable for us without her, especially grieving with our hurt. She is the only thing that I have left from my love. And when I feel sad, I call her every time, and I know her pain is greater than mine because she lost a kid.

And no matter what she is facing, she always gives me, like, encouragement words. She encourages me. No matter how sad she is, she's always like, "Okay. We're going to get through this. Don't feel sad. The Lord is with you. Keep your faith on." And she supports me in so many ways. Sometimes she doesn't know how to give me strength, but she does, and I admire her so much for that.

I really hope we can hug each other soon, and I just want her to know that we deeply love her and no matter what situation she is in right now, that's not the Karol we know, and we support her and love her so much.

THE COURT: Thank you for coming up here.

MS. ANA OVIETO: Thank you.

THE COURT: Anything else, Ms. Barron?

MS. BARRON: No, Your Honor. Thank you.

THE COURT: Thank you, especially Ms. Duarte's family, for coming here. Thank you very much for doing that, supporting her on this day. It's very important that she see that and that you do that for her. So thank you for doing that. I appreciate that.

MR. LIVENT: I'm sorry, Your Honor. I was wondering if I could talk.

THE COURT: Yeah. For her?

MR. LIVENT: Yes.

THE COURT: That's up to her lawyer.

MS. BARRON: Give me a minute. Sorry, Your Honor. This is her daughter's husband, and he does want to say a few words.

THE COURT: I'm happy to do that.

MS. BARRON: Thank you, Your Honor.

MR. LIVENT: I'm sorry. I was kind of nervous at first, so that's why I was -- I just want to --

THE COURT: First of all, tell me your name.

MR. LIVENT: Jerry Livent.

THE COURT: J-e-r-r-y?

MR. LIVENT: Yes.

THE COURT: Spell your last name.

MR. LIVENT: Livent. L-i-v-e-n-t.

THE COURT: All right, sir. I'm glad to hear from you, Mr. Livent.

MR. LIVENT: So I'm Valentina's husband, her daughter. I met her before I got with her daughter. I was living in a car, and she gave me a home. She helped me get my CDL. She helped me so much. You don't know how much she helped me. I was 17. My dad and mom, they are out of the country. I was by myself here. And she just helped me a lot. So that's why I know that she's a wonderful person, because you don't do that for nobody, you know. And she just seen me -- she seen that I had a bad cough because I've got asthma. I was living in a car. She helped me out. She took me to her

home. She helped me get a job. She helped me apply for a CDL. And I got my CDL. So I just want to say thank you. I'm sorry. I'm kind of nervous.

THE COURT: You're doing great.

MR. LIVENT: I've never done this before.

THE COURT: You're doing great.

MR. LIVENT: I just want to say that she's a wonderful person and whatever that is going on doesn't define her as a person. Thank you.

THE COURT: Thank you, Mr. Livent. I appreciate you coming up.

As I look at this case, I am greatly -- I guess "disturbed" is the right word. That's a lot of money. And it may not be -- I mean, it's not $26 million like the lawyer took, but it's $1.45 million that came from these small credit unions or these small banks. And these are real people that are getting really, really hurt.

And as I counted, I counted 45 times that the crew tried to steal money, and they were successful 28 times. And it was brazen, and it was cold. It was calculated.

And, you know, it's not lost on me the country that did it, the country that targeted us. And Lord knows where that money went when it got back to Venezuela, what it did to people in Venezuela, of how it hurt them.

So I think that that's something you've got to take

into account. It's a lot of money. It was done over a large amount of time. Like a lot of conspiracies, while it's going good, you live well, and she reaped the benefits of that.

So I don't have -- I think the fact that, um -- I understand -- first of all, as always, Ms. Barron, the best compliment I can give is you make me work hard, you make me think. It's the best compliment I can give you.

Some of this stuff in your sentencing memorandum, I understand why you did it. It's just -- I don't -- it doesn't sway me. It doesn't persuade me only because, for example, the fact that she's going to be deported. She should have been deported ten years ago. She shouldn't have been here. She overstayed her visa. She did it on purpose. She took advantage, and then she repaid that by stealing from us. That's got to be taken into account, in my mind. That's the decision that she made that she's going to have to deal with.

But what's really important to me is just the sheer amount of money and the sheer volume of what it did. They are lucky that they stopped them when they did, and God knows what these other crews are out there doing, just continuing to wreak havoc. So this is what I'm going to do.

Having considered the presentence report that was prepared following your guilty plea, I accept your plea in this case and I adjudicate you guilty of Count One of the indictment.

THE COURT: The Court has determined that the advisory sentencing range is 46 to 57 months, considering a Total Offense Level of 23 and a Criminal History Category of I.

In imposing the sentence in this case, the Court has considered the advisory sentencing range and the sentencing factors found at 18 U.S.C., Section 3553(a).

I made an individualized assessment based on the facts presented.

I commit you to the Bureau of Prisons for a period of 57 months. Following your prison term, you will be delivered to a duly authorized Immigration and Customs Enforcement official for the appropriate proceedings. If you're deported, you shall not reenter the United States unless you obtain legal means of entry. I will not have a term of supervised release.

I impose a mandatory assessment in the amount of $100. I waive the imposition of a fine, any alternative sanctions based on your financial condition.

I order you to immediately make restitution in the total amount of $1.435 million to the victims identified in the presentence investigation report through the United States District Court Clerk's Office. Financial penalties shall be paid in accordance with the Court's Standing Order 2017-02.

I give you notice that this case involves other Defendants who may be held jointly and severally liable for

the restitution imposed. The victims' restitution is limited to the amount of the determined loss in the case.

I'm advising you you have a right to appeal the sentence in this case. You did not waive that right. If you decide to appeal your sentence, you must file a notice of appeal or request the Clerk of Court to file a notice of appeal on your behalf within 14 days of judgment being filed in your case. If you are unable to afford the costs of any appeal, you have the right to ask the Court to waive the normal costs and/or appoint counsel to represent you.

Now that the findings of the Court have been made and sentence imposed, are there any objections to the sentence as to the finding of facts or conclusions of law, other than those already stated for the record? And all of those are preserved. Mr. Morrison?

MR. MORRISON: No, sir, Judge.

THE COURT: Ms. Barron?

MS. BARRON: Just object to substantive reasonableness, Your Honor.

THE COURT: That will be noted for the record. Thank you-all very much. Good luck. Yes, ma'am.

PROBATION: Sorry, Judge. For restitution, can I just get the exact figure? For restitution, $1,435,980?

THE COURT: 1,435,980.

PROBATION: Thank you.

THE COURT: That's the amount. 1,435,980. Thank you very much.

(Proceedings concluded at 1:28 p.m.)

END OF RECORD

CERTIFICATE OF OFFICIAL REPORTER

I, Tammy W. DiRocco, Federal Official Court Reporter in and for the United States District Court for the Middle District of Georgia, do hereby certify that pursuant to Section 753, Title 28, United States Code, the foregoing is a true and correct transcript of the stenographically reported proceedings held in the above-entitled matter and that the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.

Dated this 6th day of November 2025

_________________________________
Tammy W. DiRocco CCR, CVR
Federal Official Court Reporter